**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHYSICIANS HEALTHSOURCE, INC.,** | ) | |
| **an Ohio corporation, individually and as** | ) | |
| **the representative of a class of** | ) | |
| **similarly-situated persons,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 12 C 3233** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ALLSCRIPTS HEALTH SOLUTIONS,** | ) | |
| **INC. and ALLSCRIPTS HEALTHCARE** | ) | |
| **LLC,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.

### BACKGROUND

### A.

The defendants have filed a motion for summary judgment in what is, as Judge Easterbrook

remarked almost two years ago in another case, is "another of the surprisingly many junk-fax suits

under 47 U.S.C. § 227." *Chapman v. First Index, Inc.*, 796 F.3d 783, 784 (7th Cir. 2015). The

number of suits was surprising given what the court said were the simple rules applicable to the

practice of sending fax ads – simple rules that senders seemed to simply ignore. *Id.* This case is

even more surprising than most, given the contentious history between the parties – and counsel.

In any event, the defendants ask that the court, for the purposes of summary judgment, determine that

the plaintiff gave the defendants express permission to send to it all the faxes at issue.

While the plaintiff filed its suit five years ago under the Telephone Consumer Protection Act ("TCPA"), 47 USC §227, this case traces its beginnings to another junk fax case, *Geismann v. Allscripts-Misy's Healthcare Solutions, Inc.,* 09 CV 5114, which settled in February 2012. The defendants here are two successors of the defendants there, and, as a result of sending fax ads to a class of recipients, ended up paying plaintiff's class counsel – mostly the same attorneys representing the plaintiff here – about $600,000 in attorneys' fees. [09 CV 5114, Dkt. #142, at 4]. Yet, the defendants kept sending junk faxes by the thousands, seemingly as it was signing that hefty settlement check. It sent over a thousand faxes two days after it agreed to settle the case. [09 CV 5114, Dkt. #142, at 4; Dkt. #204-5, Page 224/257]. And so, a new plaintiff – this one a veteran junk fax litigator[1] – is back in court with veteran class counsel – three law firms' worth – three dozen offending junk faxes, and thousands of putative class members. So, potentially, it's very much worse for the defendants than last time. The defendants estimate it could be tagged with over $200 million in liability. [Dkt. # 215, at 26].

As the D.C. Circuit recently said in a $150 million junk fax case, "[l]et that soak in for a minute." *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1081 (D.C. Cir. 2017). That's a lot amount of money - a draconian penalty as Judge Posner called it, *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 915 (7th Cir. 2011) - for the electronic equivalent of the fliers or junk mail most throw in the trash without bothering to look at

---

[1] Teaming up with the law firm representing it here, the plaintiff has, in just the last four years, sued at least eighteen different companies in federal courts in Illinois, Indiana, Michigan, Missouri, California, Pennsylvania, New Jersey, Connecticut, Massachusetts, North Carolina, and Florida. And that includes only those cases limited to the case in which written opinions were published on Westlaw. Counsel tells us plaintiff has brought more than twenty such cases altogether. [Dkt. #204-1, at 14]. It is thus a knowledgeable and experienced litigant.

it. Of course, as Judge Easterbrook commented in *Chapman* and Judge Pillard echoed in his dissent in *Bais Yaakov*, it's ridiculously easy to avoid that exposure. *Bais Yaakov*, 852 F.3d at 1085. To which it should be added, this is the way Congress has decided to deal with the matter. And that is the end of the matter. *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 915 (7th Cir. 2011). It must be remembered that statutes are to be enforced as Congress intended and not avoided by judicial action. *Patterson v. Shumate*, 504 U.S. 753, 759 (1992). *See also Fed. Deposit Ins. Corp. v. Philadelphia Gear Corp.*, 476 U.S. 426, 441 (1986).

So, can it be that the practice is sufficiently efficacious to make it worth the risk? Intuitively, the answer would seem to be "no." Many of the faxes at issue in this case, weighed against that potential $200 million in damages are, to put in mildly, head-scratchers, why do it: the ads consist of promotions; a survey sent three weeks in a row; a free beach towel when $250 in supplies was ordered; a copy paper raffle; tickets to a minor ball game in Columbus, Ohio (the plaintiff is located 125 miles away in Cincinnati); a free pencil cup with a $300 order; the same (or nearly the same) electronic health records ad sent five times in a month; butter cookies with a $100 order. And these ads were sent in droves – as many as 8,000 a day. It was cheap when the defendants did it: three cents a fax. But now, divvying up the potential liability among the faxes, that butter cookie fax could end up costing $5.5 million. It certainly seems that some people thought the gamble (or business plan, call it what you will) worthwhile.

### B.

The statute works like this: it prohibits any person from sending unsolicited fax advertisements, unless the sender has an established business relationship with the recipient, the sender obtained the fax number through voluntary communication or a directory, and the fax

includes an opt-out notice meeting certain requirements. 47 U.S.C. §227(b)(1)(C). The statute

defines an "unsolicited advertisement" as "any material advertising the commercial availability or

quality of any property, goods, or services which is transmitted to any person without that person's

prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). Otherwise,

there must be an established business relationship. Federal regulations define "established business

relationship" as:

> a prior or existing relationship formed by a voluntary two-way communication
> between a person or entity and a business or residential subscriber with or without
> an exchange of consideration, on the basis of an inquiry, application, purchase or
> transaction by the business or residential subscriber regarding products or services
> offered by such person or entity, which relationship has not been previously
> terminated by either party.

47 C.F.R. § 64.1200(f)(6). Opt-out notices are also required for faxes sent with the recipient's

permission. *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). The provision

covering opt-out notices requires that the notice be "clear and conspicuous and on the first page" of

the advertisement, and that it state that the recipient can make a request that the sender not send any

further unsolicited advertisements, include a cost-free phone or fax number by which the recipient

can communicate its request. 47 USC §277(b)(2)(D).

For one reason or another, the faxes at issue do not comply with the opt-out notice

requirements. [Dkt. #204-1, at 18-19]. The potential monkey wrench here, however, is that in August

of 2015, the defendants sought and obtained from the FCC a retroactive waiver of the requirement

that faxes sent with permission have an opt-out notice. *Bais Yaakov of Spring Valley v. F.C.C.*, 852

F.3d 1079. The parties are at odds over whether that waiver applies to civil litigation (or simply

FCC enforcement proceedings). There is also the question of whether it trumps *Turza*'s 2013 holding

4

that "[e]ven when the Act permits fax ads – as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages." 728 F.3d at 683.

*Bais Yaakov* held that the FCC's 2006 Solicited Fax Rule was unlawful "to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d at 1079. The Seventh Circuit's prior holding in *Turza*, however, did not even mention the FCC rule, but relied exclusively on the statute, itself, when it stated that opt-out notices are required on solicited faxes. The Court said: "Even when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender – the facts must tell the recipient how to stop receiving future messages. 47 U.S.C. §227(b)(1)(C)(iii), (2)(D)." Turza, 728 F.3d at 683.

Given the vertical hierarchy of the federal courts, we are bound to follow *Turza* and are not at liberty to opt for *Bais Yaakov. See Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005); *United States v. Castro-Portillo*, 211 F. App'x 715, 722 (10th Cir. 2007); *Bell v. Hill*, 190 F.3d 1089, 1093 (9th Cir. 1999); *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994); *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015).

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must construe the evidence and all inferences that reasonably can be drawn from it in the

light most favorable to the nonmoving party. *Allin v. City of Springfield*, 845 F.3d 858, 861 (7th Cir. 2017); *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 340 (7th Cir. 2016). A factual dispute is "genuine" only if a reasonable jury could find for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). Here, the defendants are moving for summary judgment on the issue of plaintiff having granted it express permission to send the fax ads at issue. That is an affirmative defense on which the defendants bear the burden, *Momient v. Nw. Collectors, Inc.*, 666 F. App'x 531, 537 (7th Cir. 2016); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017), and so "must lay out the elements of the claim, cite the facts which they believe satisfy these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). The defendants have fallen short of making that showing here, and, so, its motion must be denied.

## B.

### The Defendants' Motion

Part of the premise of the defendants' motion for summary judgment is the concession that the plaintiff's position that it was not one of the defendants' customers is to be accepted, despite the fact that plaintiff eventually admitted at deposition that it was a customer – notwithstanding its apparent falsification about that point in discovery – which is discussed at length in the ruling on the plaintiff's motion for class certification. For the purposes of the motion for summary judgment, the defendants have eschewed the limited safe harbor of the "established business relationship," [Dkt. #213, at 1. Thus, the defendants assert that "[f]or the purposes of this motion, however, the Court can accept as true Plaintiff's sworn statement that it was not [defendants'] customer." *See* 47 U.S.C.

6

§§ 227 (b)(1)(C); (2)(D); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 99 n.4 (2nd Cir. 2017).

That means the defendants must rely on the position that the faxes it sent were not "unsolicited advertisements." As already noted, the Act defines an "unsolicited advertisement" as any "material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C.A. § 227(a)(5); [Dkt. #213, at 1 (". . . the evidence proves that [defendants] received express permission from [plaintiff] to fax information advertising its commercially available goods and services.")]. The defendants have the burden of proving they had "express permission" to fax the ads at issue. Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967-01, 25972, 2006 WL 1151584.

There are thirty-six faxes at issue. Either the plaintiff gave the defendants express permission to send those ads, or it didn't. Yet, in order to prove what seems like a seemingly simple fact, the defendants have amassed a record in support of its motion for summary judgment that approaches 1000 pages. While it's not always the case that an unwieldy or large record means that there must be a genuine issue of fact, *see U.S. ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818 (7th Cir. 2011)(affirming grant of summary judgment in *qui tam* action concerning the sale and financing of 40 F–16 fighter jets to the nation of Greece, a deal that spanned 7 years and cost over $600 billion), that's often the likely result – especially in what ought to be a rather simple case with clearly defined issues. As the Seventh Circuit said in *Adams v. Ameritech Services, Inc.,* 231 F.3d 414, 417

(7th Cir. 2000), a much more complex discrimination case with 50 plaintiffs, "[w]hile we appreciate the herculean efforts the district court made to wade through the voluminous materials on summary judgment that both sides presented, we conclude that the plaintiffs presented enough evidence to withstand the defendants' motions." 231 F.3d at 417. Motions for summary judgment in cases like *Yannacopolous* and *Adams* demand massive records. A motion for summary judgment on the question of whether a plaintiff said it was okay to fax it 36 ads ought not to. Yet, here we are.

## 1.

### Express Permission

Defendants' motion begins weakly and finishes worse. From the outset, the defendants speak of both consent and permission, using the terms interchangeably. But "consent" isn't an issue; express permission is. The two are very different. Throughout the law, consent may be express or implied. *See, e.g., Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015); *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010); *Hunter v. Amin*, 583 F.3d 486, 492 (7th Cir. 2009). But in this instance, by definition, "permission" must be "expressed." 47 U.S.C. §227(a)(5). There is no avenue for inferring or implying permission or invitation based on circumstances or conduct.

The Federal Communications Commission's rules implementing the TCPA and the Junk Fax Prevention Act make this quite clear:

> In the absence of an [established business relationship][2], the sender must obtain the prior express invitation or permission from the consumer before sending the

---

[2] Arguably, the established business relationship defense provides and avenue to show implied permission. But, again, for the purposes of this motion and the defendants' motion for summary judgment, which the defendants have insisted on combining [Dkt. #224], the defendants have chosen to paint themselves into a corner and abandon any defense based on an established business relationship.

facsimile advertisement. Prior express invitation or permission may be given by oral or written means, including electronic methods. The Commission expects that written permission will take many forms, including e-mail, facsimile, and internet form. Whether given orally or in writing, prior express invitation or permission must be express, must be given prior to the sending of any facsimile advertisements, and must include the facsimile number to which such advertisements may be sent. It cannot be in the form of a "negative option."

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967-01, 25972, 2006 WL 1151584. The Rules go on to express concern that, since permission may be obtained orally, senders might falsely submit that they had received permission to send a fax. As such, the Rules warn senders that if they choose to obtain permission orally, they must take reasonable steps to ensure that permission can be verified, such as by promptly documenting oral permission. *Id.*

It's clear from much of the material the defendants have submitted on this point that they are using to term "consent" advisedly and not as a convenient shorthand for express permission or invitation. To begin with, defendants assert that by providing its fax number or by listing it in a trade publication, a business has consented to receive all faxes. [Dkt. # 213, at 12-13]. But that's the case only where there is an established business relationship. 47 U.S.C. §§ 227 (b)(1)(C). But, as noted earlier, the defendants have said that their motion is not predicated on the existence of an established business relationship, and that they won't be pressing that point.

## 2.

### Plaintiff's Fax Policy

Defendants next argue that plaintiff's written fax policy for its employees demonstrates that there is no issue that plaintiff consented to receive the faxed ads in this case. The policy reads as follows:

WE CONSTANTLY RECEIVE JUNK EMAIL ON A DAILY BASIS. IN AN EFFORT TO CURTAIL NEW JUNK AND DECREASE THE ADDITIONAL USAGE OF OUR COPIER/FAX MACHINE, I WANT TO REMIND EVERYONE NOT TO GIVE OUT OUR PHS FAX NUMBER TO <u>ANYONE WHO MAY ASK YOU FOR IT OVER THE TELEPHONE</u> WITHOUT IDENTIFYING WHAT COMPANY THE INDIVIDUAL IS CALLING FROM. COMPANYS [SIC] THAT HAVE NOTHING TO DO WI1H OUR DAY TO DAY BUSINESS WILL OFTEN ARBITRALY [SIC] CALL AND ASK FOR THE FAX NUMBER. IF YOU GIVE IT OUT, YOU HAVE AUTHORIZED THEM TO UTILIZE OUR NUMBER AND WE SUBSEQUENTLY GET MORE JUNK FAX.

SO, IF YOU RECEIVE A CALL ASKING FOR OUR FAX NUMBER, ASK WHO IS CALLING AND WHY DO THEY NEED IT. IF THEY IDENTIFY THEMSELVES AS A REPRESENTATIVE FROM AN ATTORNEY'S OFFICE, MCO, INSURANCE CARRIER, PHARMACY, PHYSICIANS OFFICE, OR HOSPITAL, YOU MAY GIVE OUT THE NUMBER. IF YOU ARE UNSURE WHETHER TO GIVE OUT OUR NUMBER, ASK DR ELWERT OR DR. RUCH.

[Dkt. #214-30 (Defendants' Ex. 29)(Capitals and underlining in original).

Defendants argue that because individuals from plaintiff's office gave out the plaintiff's fax number on certain occasions, that meant, pursuant to this policy, that plaintiff was "consenting" to receive all the faxes defendants cared to send. [Dkt. #213, at 5]. Again, the provision of a fax number has import if there is an established business relationship. But, for the purposes of this motion, the defendants say it should be assumed there wasn't one. Moreover, the defendants quote excerpts from the plaintiff's policy, [Dkt. #213, at 5, 14-15], omitting the following:

"So, if you receive a call asking for our fax number, ask who is calling and why they need it. If they identify themselves as a representative from an attorney's office, MCO, insurance carrier, pharmacy, physician's office of hospital, you may give out the number."

The defendants did not fit into any of the above categories, and the omitted portion of the Policy meant that the fax number was not to be given to anyone who did not fit into one of the above slots. So if the policy were followed, the plaintiff would not have routinely given out its fax number

to the defendants.

While the quotation of the policy in the defendants' brief contains ellipses, deleting portion of quotes that are significant – and the omitted portion fits that definition – is frowned upon by all courts. *See, e.g., Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 322 (1985); *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC,* 626 F.3d 958, 966 (7th Cir. 2010); *Swanson v. Bank of America, N.A.,* 563 F.3d 634, 636 (7th Cir. 2009);Posner, Overcoming Law 277 (1995).

It's difficult to see how the evidence shows, as summary judgment requires, that the plaintiff's claimed policy means that the policy was invariably followed, and the plaintiff, by giving permission for specific faxes from specific parties, but not others, consented to all the faxes at issue here. At most, the argument and evidence raises a question of fact as to whether the plaintiff, through an employee who might have given permission to defendants to send a specific fax or faxes, thereby gave blanket permission for the sending of all faxes of any character. The fact that the policy includes language warning employees "if you give it out, you have authorized them to utilize our number and we subsequently get more junk fax", doesn't mean that's the law.

In fact, it is no more on its face than someone's conclusion about the consequences of certain actions. And that implied opinion is meaningless in deciding what the statute means. It's a warning to employees of what the author of the policy thinks possible consequences might be in this context: if they give out the fax number, plaintiff will get more unwanted faxes. The clear policy is not to give out the fax number unless the call is from a limited class of entities that did not include the defendants.

Without more, the policy shows nothing. It certainly does not warrant summary judgment in

the defendants' favor. For defendants, though, it proves that plaintiff knew if it gave out its fax number to the defendants, even for one limited circumstance, that meant it consented to receive "any and all faxes" from defendants. But even if that's what the plaintiff thought – and again, the policy is clearly a worst-consequences warning to employees – that doesn't mean that's what the law is. Again, the giving out of the fax number is part of the established business relationship defense and defendants insist we assume there wasn't one.

The defendants rely on two cases, *CE Design v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011) and *Practice Mgmt. Support Servs., Inc. v. Appeal Sols, Inc.*, 2010 WL 748170 (N.D.Ill. Mar. 1, 2010). But the fact patterns in those two cases have little or nothing to do with the circumstances here, and neither stands for the proposition that granting permission to send one fax means a blanket consent to any and all faxes from then on. In *CE Design v. King Architectural Metals, Inc.*, the plaintiff not only posted its fax number on its website and invited all to "contact us", but – and the Seventh Circuit found this more important – it knowingly made itself part of an online directory that published its fax number, and specifically consented to receive faxes when it filled out the form for the directory from anyone who used the directory. 637 F.3d at 725. Similarly, in *Practice Mgmt. Support Servs., Inc. v. Appeal Sols, Inc.*, 2010 WL 748170 the plaintiff visited the defendants' website and filled in a form to receive information from defendants' business. In so doing, the plaintiff provided its fax number even though the website did not require it. *Id*. at *1, 3.

There is no evidence in the record that the plaintiffs gave the defendants any such blanket permission to send "any and all faxes." Defendants rely, in the main, on testimony from Geri Monhollen, one of plaintiff's employees. But that testimony is speculative, and "[s]peculation is no substitute for evidence at the summary judgment stage" and speculation does not succeed in a

summary judgment proceeding. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014).

All the defendants can show is that, hypothetically, there might be instances where Ms. Monhollen would give permission for information about using defendants' medical billing software to be faxed. In other words, "support" for the product the plaintiff had purchased. [Dkt. #214-5, Monhollen Dep., at 67-68]. For example, Ms. Monhollen testified that:

> A: . . . if -- they would call me and say, you know, "Can I fax this over to you?" I would say, "Yes." And I would let staff know I was expecting a fax. And it would come. And I would complete whatever it was that they gave me. And I would fax it back.
>
>        \*       \*       \*
>
> Q: . . . I just want to go back and clarify what you said earlier. That you would ask them for information. And you would ask them to send you information. And they would send it to you by fax?
>
> A. Well, they would say, "Can we send this over to you by fax?" And I would say, "Yes."

[Dkt. #214-5, Page 30-31/61 (Monhollen Dep., at 68-69)].

Beyond being merely hypothetical, the questions focused on what would be "transactional faxes," not junk fax ads. So even if defendants could show that Ms. Monhollen actually gave express permission for a fax, that's not permission to send fax ads as the spirit moved the sender. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967-01, at 25973 (explaining that while a fax that advertises the commercial availability of goods, but purports to be a price sheet would be an unsolicited advertisement, "if not sent for the purpose of facilitating, completing, or confirming an ongoing transaction."). *See also Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847

F.3d 92, 101 n.6 (2nd Cir. 2017)(noting distinction between transactional faxes and faxed advertisements); *Absolute Health Ctr., Inc. v. Multiplan, Inc*., 2016 WL 7868822, at *3 (D. Colo. 2016); *Vinny's Landscaping, Inc. v. United Auto Credit Corp*., 207 F. Supp. 3d 746, 750 (E.D. Mich. 2016).

Staying in the realm of the hypothetical, the defendants point out that Ms. Monhollen also testified that if someone called and asked if they could fax information about a specific product, she would generally defer to one of the doctors (Ruch), but if she was "intrigued" by it and thought the business would benefit, she would say yes. [Dkt. #214-5, Page 50/61 (Monhollen Dep., at 100)]. None of this suggests what the defendants are arguing: that plaintiff gave general permission for defendants to send it any and all fax advertisements defendants wanted to, whenever they wanted to. That means faxes about free cookies, beach blankets, or anything else of concern to the defendants. There's nothing to show Ms. Monhollen was "intrigued" by any of that. At best, Ms. Monhollen's testimony shows that, hypothetically, she *might* have given permission to defendants to send a specific fax when she asked them for information about using a product. Free cookies are not information about product. The fax would simply be an indirect – and, perhaps, an ineffective one – to get more sales.

This case is about three dozen or so specific faxes. In their motion for summary judgment, defendants point to no evidence that Ms. Monhollen actually gave express permission to defendants to send any of the faxed advertisements at issue here, or any advertisement at all. At her deposition, she testified she had no recollection of doing so. [Dkt. #214-5, Page 53-54/61 (Monhollen Dep., at 132-33)]. That doesn't eliminate a genuine issue of fact for trial; it highlights the fact that there is one. It will be for the jury to resolve credibility.

## 3.

### Defendants' Fax Policy

Clearly, defendants' main problem is that they didn't care about the statutory command or heed the FCC's warning about documenting whether a business gave it express permission to send it faxed advertisements. And that makes it a very difficult affirmative defense to prove on a motion for summary judgment. So, without pointing to any supporting evidence, defendants claim they had a policy of obtaining express permission prior to sending any fax and relies on testimony from its "corporate representative." [Dkt. #213, at 18]. Defendants don't reveal that person's position with the company, but, assuming he was in charge of all the faxing, his testimony only raises the question of what he thinks – and what defendants think – getting express permission means.

Mr. Moffett testified that he "would always tell [his] staff make sure you get permission . . . ." [Dkt. #214-4, Moffett Dep., at 40]. "First, you had to have permission," he said, "and then once you had permission, we would send them the fax." [Dkt. #214-4, Moffett Dep., at 64]. He explained that the fax number had to be verified "because you couldn't just send something knowing they might not get it, so . . . you always verified the fax number and ask permission." [Dkt. #214-4, Moffett Dep., at 40-41]. He was unable to say, however, if that was a written policy. [Dkt. #214-4, Moffett Dep., at 41]. On its face, and without more from defendants, given the evidence regarding defendants' faxing habits, that testimony strains credulity but that's not for us to decide on this motion.

That's because defendants' faxes came in blizzards. For example, on May 4, 2008, defendants sent faxes to 5,113 recipients. [Dkt. #204-5, Page 2/257]. They sent faxes to a combined 9,065 recipients on May 26 and 30, 2008. [Dkt. #204-5, Page 3-4/257]. In other words, nearly 10,000

faxes to nearly 10,000 businesses in less than a week.  On September 21, 2008, defendants blasted faxes to 8,285 recipients.  [Dkt. #204-5, Page 12/257].  Defendants sent faxes to 10,400 businesses on November 24 and 25, 2008.  [Dkt. #204-5, Page 24/257].  There was another storm December 15-17, 2008:  more than 15,203 faxes.  [Dkt. #204-5, Page 39-40/257].  Over two days in February 2009, defendants' faxes snowed down on just over 21,000 recipients.  [Dkt. #204-5, Page 39-40/257]. Even as April turned to May in 2009, winter faxing wasn't over.  From April 28 to May 1, there was a blizzard of over 38,000 faxes.  [Dkt. #204-5, Page 61-70/257].  There were another 21,000 or so from May 4 to May 7.  [Dkt. #204-5, Page 71-72/257].  May 20 and May 22 brought over 18,699.  [Dkt. #204-5, Page 78-79/257]. The examples, of course, go on and on.

Paraphrasing the D.C. Circuit's take on potential damages in junk fax cases, let *that* soak in a minute.  Mr. Moffett testified that his staff  "always" got permission before sending "the fax" and "always verified the fax number and ask[ed] permission." Assume two-minutes to reference a phone number, call, verify the fax number and get express permission, and note permission – and that's a very conservative estimate.  Assume there are no unsuccessful calls – and that's a fantastic assumption.  That means for the fax blast at the end of February 2009, Mr. Moffett's staff spent 700 man-hours – or 17 man-weeks – getting express permission for those beach towel or butter cookie ads.   For April 28 to May 1, 2009, it would have taken 1266 man-hours to get express permission. That would take one person 8 months; a staff of 32 might accomplish it, doing absolutely nothing else, working solidly for an entire week! A judge doesn't give up his/her common sense when they become a judge.

So, clearly something else was going on.  But, we don't know the procedure defendants used to obtain express permission to send a fax ad.  Mr. Moffett refused to answer what defendants'

16

understanding of the law regarding sending fax ads was. [Dkt. # 214-4, Moffett Dep., at 42]. Did they operate on a permission for one, permission for all basis? In other words, was Mr. Moffett's policy that if a business asked for a transactional fax – say, instructions on a product they had purchased – that meant they had given express permission for defendants to fax ads for anything? All we can glean along these lines from Mr. Moffett's testimony is that *he* seemed to think that, if a business had purchased a product from defendants in the past, that meant "[defendants] would have had permission to fax them" ads. [Dkt. #214-4, Moffett Dep., at 65]. While that might be true if the defendants are asserting that they had an established business relationship and the elements of that defense are proven, defendants have eschewed that defense for the purposes of this motion. As a result, in the context of the defendants' motion and the ground rules the defendants have insisted on, Mr. Moffett's testimony is all but meaningless.

### 4.

### Defendants' Records

That leaves, as defendants' evidence of express permission, its Salesforce records. [Dkt. #213, at 18-19]. Unfortunately for defendants, they failed to disclose the witness who was to provide the necessary foundation and explain those records, and that witness's affidavit has been stricken. [Dkt. #283, at 15-21]. Accordingly, these records are no longer properly before the court in this summary judgment proceeding. But, even if they were properly part of the record, it would have to be said that defendants' assertion that the Salesforce records prove that the plaintiff gave it express permission to fax it advertisements doesn't hold water.

Defendants claim that the Salesforce record shows two occasions where plaintiff's personnel gave defendants permission to fax ads. [Dkt. #213, at 18]. The first supposedly came in late 2008,

and concerned the electronic health records stimulus package. The Salesforce entry, dated November 4, 2008, states that "Dr. Ruch . . . want[ed defendant's employee] to *mail* him some lit[erature]." [Dkt. #214-20, Page 2/14 (emphasis supplied)]. Mailing, of course, is not faxing, and asking someone to mail you literature is not granting them express permission to fax ads. The story unravels further when defendants explain that they sent plaintiff the "first fax" about electronic health records "on April 28, 2009, after [plaintiff] gave permission." [Dkt. #214, at 6-7]. But the Salesforce entry states that the packet of literature was sent – presumably mailed, because that's what the doctor requested and permitted – on November 4, 2008. [Dkt. #214-20, Page 2/14]. There's nothing to indicate that plaintiff gave permission to send ads about the electronic health records stimulus package by fax months later.

Worse, the April 28, 2008 fax the defendants refer to provides no information whatsoever. It's a "survey" asking the recipient whether it had an electronic health records system in place, or whether it just didn't want one, or whether it wanted more information on the package. Fill out the "survey" and you could win a prize. [Dkt. #214-18, at Page 2/18]. Defendants sent plaintiff the same "survey" three times in a week. [Dkt. #214-18, at Pages 2-4/18]. So, to sum up, if a business asks the defendants to *mail* them a specific packet of literature about a specific topic, for the defendants that equates to providing express permission to *fax* any and all ads arguably touching on the topic starting five months later. That is not the kind of persuasive and decisive evidence Rule 56 contemplates and requires.

The only other instance from the Salesforce records that defendants can point to in support of its express permission to send faxed ads argument is dated January 11, 2008. One of plaintiff's employees wanted to order a new computer backup battery and asked defendants' employee to fax

price quote. [Dkt. #214-29, Page 12/12]. If such a fax was sent, again, that's a transactional fax, facilitating an ongoing purchase, not a fax ad. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967-01, at 25973 (explaining that while a fax that advertises the commercial availability of goods, but purports to be a price sheet would be an unsolicited advertisements, "if not sent for the purpose of facilitating, completing, or confirming an ongoing transaction."); *see also Boehringer Ingelheim*, 847 F.3d at 101 n.6 (noting distinction between transactional faxes and faxed advertisements); *Absolute Health*, 2016 WL 7868822, at *3; *Vinny's Landscaping*, 207 F. Supp. 3d at 750.

Because the defendants have failed to demonstrate they are entitled to summary judgment; because they have failed to show that "the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on" the issue of express permission. *Hotel 71*, 778 F.3d at 601, we need not wade into the quagmire that is the opt-out rule in express consent situations, the F.C.C.'s granting of a waiver of that rule, and the conflict between the D.C. Circuit's holding in *Bais Yaakov* and the Seventh Circuit's holding in *Turza*. But it is very clear that the defendants are picking and choosing from among their favorite parts of rules and cases, and that only tends to show their position is weak.

For example, defendants' theory is clearly that permission to send any type of fax at all, even a fax that is part of an ongoing business transaction, means blanket permission to send any fax whatsoever, including faxes about raffles, free beach towels, or free butter cookies. Or, at the very least, that permission to send one ad mean permission to send all ads – although the defendants haven't established there was any such permission for the purposes of its summary judgment motion. Defendants do not provide any support for this position until their reply brief, where they purport to

quote from the FCC's Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005 (May 3, 2006)("2006 FCC Rule"):

> "'Express permission need only be secured once from the consumer in order to send facsimile advertisements.'"

[Dkt. #274, at 13 (quoting 2006 FCC Rule)]. Setting aside for the moment that providing a basis for an entire theory of a case in a reply brief is too little too late, *see Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 678 (7th Cir. 2009); *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir.2005),[3] that quote y supports defendants' theory. The problem is, it is a misquote, as we show below.

Courts disapprove of replacing significant portions of quotes with ellipses. *See e.g., May Dept. Stores Co. v. Federal Ins. Co.,* 305 F.3d 597, 599 (7th Cir.2002); *United States v. Johnson,* 187 F.3d 1129, 1132 (9th Cir.1999); Posner, Overcoming Law 277 (1995). That is a bad enough practice, but the defendants don't indicate the deletion of an entire clause. The passage actually reads: "[e]xpress permission need only be secured once from the consumer in order to send facsimile advertisements to that recipient *until the consumer revokes such permission by sending an opt-out request to the sender.*" 2006 F.C.C. Rule, 71 FR 25967-01, 25972. (Emphasis supplied). This, of course, goes hand in hand with the FCC's conclusion just two sentences later that "entities that send facsimile advertisements to consumers from whom they obtained permission must include on the advertisements their opt-out notice and contact information to allow consumers to stop unwanted faxes in the future." *Id.* The defendants didn't comply with the opt-out notice rule. But they want to have theirs cake – blanket permission after one permitted ad – and eat it, too – ignore the opt-out

---

[3] Of course, this goes for arguments defendants raises for the first time in its reply brief about a "January 6/7 2010 Fax."

provision requirement.

Now granted, that was before the waiver monkey wrench – not to mention the D.C. Circuit's ruling in *Bais Yaakov* – was thrown into the mix but, again, having found against defendants' express permission argument, that's a matter, perhaps, for another day and perhaps, another court. Truth be told, if defendants had negotiated the hurdle of expression permission in its summary judgment motion, their arguments on the waiver of the opt-out requirement would likely have been unconvincing and inadequate.

The waiver of the opt-out requirement for ads faxed with express permission came about when the FCC, fielding petitions from scores of companies, determined "that a footnote contained in the [2006 FCC Rule] caused confusion regarding the applicability of this requirement to faxes sent to those recipients who provided prior express permission or created a false sense of confidence that the requirement did not apply." Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 FCC Rcd. 13998, 14005 (2014). "As a result," the FCC found "good cause exist[ed] to grant individual retroactive waivers of" the rule requiring ads faxed with express permission to include an opt-out notice. *Id.* That would have been footnote 154, buried among another 107 footnotes in a 42-page document that made explicitly clear in its text – twice – that an opt-out notice was required. In any event, that footnote apparently confused businesses like the defendants, and they followed that footnote rather than the text or the codified rule.[4]

The defendants leave a few unanswered questions in their motion for summary judgment.

---

[4] So, the defendants supposedly fixated on this obscure footnote, while clearly ignoring the wording in the text to either get written permission or promptly document oral permission. Still, at least a few of the faxes include opt-out notices, albeit ones that aren't compliant with the requirements of the statute, so it's hard to say just what the defendants might have been thinking.

Such as how the waiver of the opt-out requirement jibes with the Seventh Circuit's holding that the TCPA requires opt-out notices on faxes sent with the express permission of the recipient. *See Turza*, 728 F.3d at 683. As discussed, the waiver was based on supposed confusion stemming from a footnote in an FCC rule; the Seventh Circuit didn't consider that rule and based its statement of what the law required on the statute. According to the FCC, in granting the waiver, it was "interpreting a statute, the TCPA, over which Congress provided the Commission authority as the expert agency." That seems debatable, as it reiterated, in the waiver order, that its interpretation of the statute was that an opt-out notice was required in a fax sent with express permission.

But, assuming the waiver was an interpretation of the statute, does the FCC waiver trump the clear Seventh Circuit pronouncement in *Turza*? *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005)("The better rule is to hold judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). It's a question the defendants leave unresolved.

Moreover, it would seem that the D.C. Circuit's vacating of the FCC's ruling that faxes sent with express permission scotches the defendants' theory is drawn from a misquote of a portion of that ruling, that permission for one fax ad is permission for all. It's pretty clear that the FCC never would have said that express permission need only be secured once if there was also not a requirement of an opt-out notice. *See Bais Yaakov*, 852 F.3d at 1080 (noting the FCC's position "that it has reasonably defined the phrase 'prior express invitation or permission' to mean that prior

express permission lasts only until it is revoked, and that all fax advertisements—even solicited fax advertisements—therefore must include a means to revoke that permission.").

Suffice it to say, the defendants left a lot on the table. Without development of these issues from the parties, it would be inappropriate to tread any further. *Arnold v. Villarreal*, 853 F.3d 384, 388 (7th Cir. 2017); *Kay v. Board of Educ. of City of Chicago*, 547 F.3d 736, 738 (7th Cir. 2008); *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1214 (7th Cir. 1993). In sum, the defendants have not shown they are entitled to summary judgment on the theory that they received express permission to fax ads to the plaintiff.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [Dkt. # 209] is denied.

**ENTERED:** _____
                 **UNITED STATES MAGISTRATE JUDGE**

**DATE: 6/2/17**