**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHYSICIANS HEALTHSOURCE, INC.,** | ) | |
| **an Ohio corporation, individually and as** | ) | |
| **the representative of a class of** | ) | |
| **similarly-situated persons,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | No. 12 C 3233 |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ALLSCRIPTS HEALTH SOLUTIONS,** | ) | |
| **INC. and ALLSCRIPTS HEALTHCARE** | ) | |
| **LLC,** | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

**INTRODUCTION**

"Plaintiff is a professional class-action plaintiff who regularly works with [Law Firm of] Anderson & Wanca to file TCPA cases." *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *7 (S.D. Fla. 2014).[1] The plaintiff has moved for certification of this "junk fax" case as a class action under Fed.R.Civ.P. 23(a) and 23(b)(3). Denial of class certification and of a finding that the plaintiff and/or its counsel is not appropriate is reviewed for an abuse of discretion. *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 591 (7th Cir. 2011). Thus, review is deferential, but not abject. *CE Design, Ltd.*, 637 F.3d at 723.

The defendants have objected to certification and have filed a cross-motion for summary judgment, submitting that the plaintiff gave its express permission to send it faxes advertising

---

[1] It is "not unlawful to be a professional class action plaintiff" and have a "business model" that combines being a "professional class action representative." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). *See* n.4, *infra*. But it does not give the plaintiff special privileges or the right to ignore the rules which govern the conduct of all other litigants.

defendants' goods and services. The materials filed in connection with the motion for class certification total 1105 pages. At first blush, this seems not to bode well for what ought to be an uncomplicated showing of requisite class action elements like commonality, typicality, and predominance. The materials filed in connection with defendants' summary judgment motion add up to about the same: 1166 pages. Likewise, it is somewhat counterintuitive (although by no means conclusive) that there is no genuine issue of fact in those lengthy materials, especially when the question presented seems so basic: did the plaintiff give the statutorily required permission to the defendants to fax it advertisements.

To complicate things even more (due in large measure to the presentation of the defendants), the two motions are inextricably intertwined, making review of the parties' arguments and evidence difficult. Time-honored warnings, such as the impermissibility of asking a judge to play archaeologist with the record, *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014), or hunt for truffles buried in briefs, *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015), come to mind. The Seventh Circuit's advice in *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006) that counsel for both sides should endeavor to make it easier for the court to rule in their client's favor – does not.

We turn to the motion for class certification.

## I.
## BACKGROUND

The plaintiff filed this suit five years ago under the Telephone Consumer Protection Act ("TCPA"), 47 USC §227, which prohibits any person from sending unsolicited fax advertisements, unless the sender has an established business relationship with the recipient, the sender obtained the

fax number through voluntary communication or a directory, and the fax includes an opt-out notice

meeting certain statutory requirements. 47 USC §227(b)(1)(C). The statute defines an "unsolicited

advertisement" as "any material advertising the commercial availability or quality of any property,

goods, or services which is transmitted to any person without that person's prior express invitation

or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). Federal regulations define

"established business relationship" as:

> a prior or existing relationship formed by a voluntary two-way communication
> between a person or entity and a business or residential subscriber with or without
> an exchange of consideration, on the basis of an inquiry, application, purchase or
> transaction by the business or residential subscriber regarding products or services
> offered by such person or entity, which relationship has not been previously
> terminated by either party.

47 C.F.R. § 64.1200(f)(6).

Opt-out notices are also required for faxes sent with the recipient's permission. *Ira Holtzman,*

*C.P.A. v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). The provision covering opt-out notices requires

that the notice be "clear and conspicuous and on the first page" of the advertisement, state that the

recipient can make a request that the sender not send any further unsolicited advertisements, and

include a cost-free phone or fax number to which the recipient can communicate its request.  47

U.S.C. §277(b)(2)(D). For one reason or another, the faxes at issue here do not comply with the opt-

out notice requirements. [Dkt. #204-1, at 18-19].

The potential monkey wrench is that in August of 2015, three years after the suit was filed,

the defendants sought and obtained from the F.C.C. a *retroactive* waiver of the requirement that even

faxes sent with permission have an opt-out notice.  The parties are at odds over whether that waiver

applies to civil litigation (or simply FCC enforcement proceedings) and whether it trumps Seventh

Circuit precedent in which our Court of Appeals has said "[e]ven when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages." *Turza*, 728 F.3d at 683.

Recently, the Court of Appeals for the D.C. Circuit vacated the FCC's 2006 Solicited Fax Rule and held that "the . . . Rule is . . . unlawful to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov of Spring Valley v. F.C.C.*, 852 F.3d 1078, 1079 (D.C.Cir. 2017). The Seventh Circuit's holding in *Turza*, however, did not even mention the FCC rule, but relied exclusively on the statute, itself, when it said that opt-out notices are required on solicited faxes. *See* 728 F.3d at 683 ("Even when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages. 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D)"). Given the institutional hierarchy of the federal courts, we are bound to follow *Turza*, not *Bais Yaakov*. *See Hays v. United States*, 397 F.3d 564, 567 (7th Cir. 2005); *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994). *See also United States v. Castro-Portillo*, 211 F. App'x 715, 722 (10th Cir. 2007); *Bell v. Hill*, 190 F.3d 1089, 1093 (9th Cir. 1999).

## II.
## FACTS OF THE CASE

On its surface, the suit is about plaintiff's claim that defendants violated the Act by sending it anywhere from 32 to 36 faxes [Dkt. #204-1, at 2-3]; plaintiff's claims vary throughout the case and even in its motion for certification. The faxes were sent between July 2008 and December 2011, on an average of about once a month. [Dkt. #204, Page 2/3]. But when the surface is scratched, this

case is perhaps something of a continuation of a discovery dispute from a case that has been settled, *Geismann v. Allscripts-Misy's Healthcare Solutions, Inc.,* 09 CV 5114, liberally seasoned with some leftover animosity between the parties and especially between their counsel.

That much is clear from the opening paragraph of the Complaint, which alleges that, in the previous case, the defendants withheld the 32 faxes at issue now, thereby, it is alleged, perpetrating a "fraud . . . upon the [plaintiffs] and [Magistrate] Judge Young B. Kim who presided over the case." [Dkt. #78, ¶ 1]. If the defendants have it right, the plaintiff could have filed a motion to vacate the final approval order in that case under Fed.R.Civ.P. 60(b)(3). Or, it could have asked for other relief against the defendants and their counsel. But the plaintiff's lawyers chose instead to file another junk fax case. That is a strategic decision – by which it is bound. *Crowe ex. rel. Crowe v. Zeigler Coal Co.,* 646 F.3d 435, 444 (7th Cir. 2011); *Abbott Laboratories v. Takeda Pharmaceutical Co. Ltd,* 476 F.3d 421 (7th Cir.2007). In any event, it is not productive to attempt to recreate now what happened in discovery in another case years earlier. Nor is it necessary.[2]

The Complaint, which appears to be based on earlier Complaints in other cases,[3] is premised on a view of junk faxes that in a certain respect harkens back to a less sophisticated era – although one which has not fallen totally into desuetude. It alleges that:

> [u]nsolicited faxes damage their recipients. A junk fax recipient loses the use of his fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's

---

[2] It is not as though plaintiff's lawyers are not highly experienced lawyers in TCPA cases. *See Bridgeview Health Care Ctr., Ltd. v. Clark,* 816 F.3d 935, 941 (7th Cir. 2016). So far as we can tell on this record, aggrieved counsel took no action to bring the matter to the attention of the disciplinary committee of this court or any other disciplinary body capable of determining whether a fraud had been committed on the court and what should be done about it.

[3] For example, paragraph three of the Complaint in this case is identical to paragraph three in the Complaint in one of plaintiff's counsel's TCPA cases from 2006. *G.M. Sign, Inc. v. Franklin Bank SSB,* 06-cv-0949 [Dkt. #1, Page 10/67].

> valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy. Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message. A junk fax consumes a portion of the limited capacity of the telecommunications infrastructure serving the victims of junk faxing.

[Dkt. #78, ¶ 3].

This preamble to the Complaint recalls the original statement of legislative intent from a quarter century ago. *See* S. REP. 102-177, 20 (Oct. 8, 1991). But, much has changed since 1991. Even on a traditional fax machine, the cost to receive a fax in terms of ink and paper is about 2 cents. *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 941 (7th Cir. 2016)("Fax paper and ink were once expensive, and this may be why Congress enacted the TCPA, but they are not costly today."); Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking the Right Balance in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer Protection Act*, 90 Neb. L. Rev. 70, 84 (2011).

That makes – it could be argued – the monetary damages to the plaintiff here about 72 cents. [Dkt. #1, ¶11, Dkt. #1-2, Pages 2-37/37]. And, of course, it is easy to throw a traditional fax, like a piece of junk mail, in the trash. *Am. States Ins. Co. v. Capital Associates of Jackson Cty., Inc.*, 392 F.3d 939, 942 (7th Cir. 2004). But even that view of junk faxes is outdated as the traditional fax machine goes the way of the dinosaur. Most faxes are now received on computer fax servers that allow the recipient to view faxes on their computer and decide whether or not to print the document, reducing the cost to essentially zero. *Linetsky*, 90 Neb. L. Rev. at 85. A recipient's seclusion – not so much privacy – might be disturbed by the whir of a traditional fax machine, like the jangling of a telephone, but the computer fax server has even eliminated or significantly reduced that concern.

*Am. States*, 392 F.3d at 942.

But, even if the above is correct, we are not at liberty to disregard the will of the Congress. "While a statute remains on the books...it must be enforced rather than subverted." *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). A judge "is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness." Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921). "Disagreement with congressional policy" is not permitted, *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007), and a judge is not entitled to override Congress's contrary view. *See Patterson v. Shumate*, 504 U.S. 753, 759 (1992); *Fed. Deposit Ins. Corp. v. Philadelphia Gear Corp.*, 476 U.S. 426, 441 (1986); *United States v. Roberson*, 474 F.3d 432, 434 (7th Cir. 2007). Even in a junk fax case, the statute "is what it is." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 915 (7th Cir. 2011)(Posner, J.).

Still, one must wonder why the defendants continued to send the very type of junk faxes, at least to the plaintiff, that got them into such expensive difficulty in the first place. The defendants licensed medical billing software to the plaintiff; their faxes, though, touted free beach towels and cookie jars with office supply orders. The settlement agreement in the prior case does not indicate the payout to the class, but the defendants had to pay plaintiff's counsel nearly $600,000 in attorney's fees and expenses. [*Geismann v. Allscripts-Misy's Healthcare Solutions, Inc.,* 09 CV 5114; Dkt. #142, ¶ 12]. Remarkably, the defendants sent at least three of the faxes at issue here *after* it had reached terms in the *Geisman* case. [Dkt. #78, ¶12; *Geismann v. Allscripts-Misy's Healthcare Solutions, Inc.,* 09 CV 5114; Dkt. #130].

These types of faxes were sent in groups of 4,000 or 5,000, or 7,000 or 8,000 at a time. [Dkt. #204-5]. One might think a business that had just agreed to pay well over a half million dollars in

legal fees, over and above monetary damages, would adjust its marketing strategy a bit. Or, at the very least, stop sending faxes to what might be one of the more litigious businesses, in terms of junk fax litigation, in the country.[4]

Whatever efficacy faxes such as these might have, it's hard to believe it's worth the risk and cost of a junk fax suit. While the penalties for sending multiple faxes can get to be draconian as Judge Posner has observed, *Creative Montessori Learning Centers*, 662 F.3d at 915, damages per recipient pale in comparison to the attorney's fees. *Id.* at 915-16. Damages under the Act are $500 or, at most, $1500 per fax if a violation is proven willful, and damages are trebled. 47 U.S.C. §227(b)(3). Attorney's fees to plaintiff's counsel can be infinitely more and constitute a significant threat to violators of the Act. The potential for attorney's fees to a losing defendant under this "obscure statute," can have an *in-terrorem* effect and result in a settlement of even a questionable case. *Creative Montessori Learning Centers*, 662 F.3d at 915-916. These cases are almost invariably brought as class actions, *id.* at even though the Act's sponsor, Senator Hollings, contemplated that individuals would bring TCPA claims *pro se* in small claims court.[5] That has proven to be an unrealized hope, and court after court agrees, generally without the need for extensive discussion,

---

[4] One would think that a business, let alone one that was just sued successfully, ought to at least pause before sending any further fax to its successful adversary – especially the kind of faxes involved in this case. Teaming up with the Law Firm, Anderson & Wanca, representing it here, the plaintiff has, in just the last four years, sued at least eighteen different companies in federal courts in Illinois, Indiana, Michigan, Missouri, California, Pennsylvania, New Jersey, Connecticut, Massachusetts, North Carolina, and Florida. And that includes only those cases in which written opinions were published on Westlaw. Counsel tells us plaintiff has brought more than twenty such cases altogether. [Dkt. #204-1, at 14]. It is precisely for that reason that the plaintiff cannot engage in discovery as it has in this case.

[5] 137 Cong. Rec. S 16205-06 (daily ed. Nov. 7, 1991) (statement of Senator Hollings). More than 2,300 lawsuits were filed in 2014 (compared to 1,100 in 2012, 350 in 2010, and 16 in 2008). Daniel T. Stabile, *The "Strangest Statute" Chief Justice Roberts Has Seen: Uncertainties of Litigating TCPA "Junk Fax" Class Actions*, Fla. B.J., November 2015, at 30; Linetsky, *supra* at 6, 90 Neb. L.Rev. at 94-97.

that "small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Pastor v. State Farm Mut. Auto. Ins. Co*, 487 F.3d 1042, 1047 (7th Cir. 2007).

This case is entering its sixth year, and its docket comprises over 7000 pages of entries. As already noted, the cross motions at issue here, alone, comprise more than 2200 pages. A satellite motion to strike, brings that figure toward 3000 pages.[6] The cost to the taxpayers, who are, after all, in a fashion subsidizing the resolution of this dispute, is already significant and continues to grow. Yet, from the plaintiff's business perspective, all this is about two or three dozen faxes sent over the course of three and a half years – meaning the plaintiff's fax machine, if there was one, didn't even "whir" at an average of once a month. And, as already noted, all of this was (allegedly) part and parcel of a case that settled more than four years ago for a great deal of money.

But, the statute is what it is and thus is to be enforced as Congress intended and not evaded by judicial action. *See* cases *supra* at 7.

### III.
### THE PUTATIVE CLASSES

Plaintiff hopes to certify two classes of fax recipients in this case:

Class A – All persons or entities who were successfully sent one or more faxes stating: (1) "The Ten Second Stimulus Survey," and were sent April 28, 2009, April 30 , 2009, and May 7, 2009; (2) "Backup Tape Sale Purchase 5 backup tapes before May 29, 2009," and were sent on May 19, 2009; (3) "EHR Stimulus Tour – Coming to Lexington KY," and were sent on September 29, 2009, and October 6, 2009; (4) "You're Invited Live Web Event with Glen Tullman," and were sent on December 1, 2009; (5) "EHR Stimulus Tour – Coming to Indianapolis, IN," and were sent on January 22, 2010, and February 1, 2010; (6) "Are You Feeling Lucky Win $105 in Copy Paper," and were sent on March 4, 2010; (7) "Spring Savings when you order

---

[6] To put the volume of submissions in context, if counsel had faxed these pages to the court, and the court sued them under the TCPA, they'd potentially be on the hook for over $4 million in damages.

online," and were sent on April 2, 2010; (8) "You're Invited – Exclusive EHR Summit at ACE 2010," and were sent on June 2, 2010; (9) "Have you ordered your 2011 Codebooks?", and were sent on June 22, 2010; (10) "Take Me Out to the Ballgame," and were sent on June 23, 2010; (11) "Free Webinar Allscripts Payerpath Denial Management," and were sent on July 16, 2010; (12) "Allscripts You're Invited Tiger/PM User Group Meeting and Opening Door to the Digital Office," and were sent August 12, 2010; (13) "Allscripts End of Summer Special when you order online," and were sent August 18, 2010; (14) "Allscripts How do I pay for an Electronic Health Record now when my Stimulus payments won't come until later," and were sent on September 21, 2010, October 14, 2010, and October 28, 2010; (15) "How Do I pay for an Electronic Health Record when my Stimulus payments won't come until later," and was sent on September 30, 2010; (16) "Allscripts Tiger EHR Enablement Program Exclusive Program for Tiger Clients," and were sent on October 26, 2010, and November 30, 2010; (17) "Backup Tape Sale Purchase 5 backup tapes before December 31, 2010," and were sent December 2, 2010; (18) "Tiger EHR Enablement Program," and was sent on December 29, 2010; (19) "Allscripts would like to wish you a Happy Valentine's Day and Give You a Free Gift," and were sent on February 4, 2011; (20) "Allscripts Prepare for ICD-10-CM," and were sent on March 23, 2011; (21) "Have you ordered your 2012 Codebooks?," and were sent on June 3, 2011; (22) "Backup Tape Sale Purchase 5 backup tapes before December 31, 2011," and were sent on November 1, 2011, and December 1, 2011; and (23) "Allscripts Paperless Year End," and were sent on December 5, 2011; and (24) "New Customer Appreciation Copy Paper Special," and were sent on January 6/7, 2010.

Class B – All persons or entities who were successfully sent one or more faxes stating: (1) "Backup Tape Sale Purchase 5 backup tapes before December 31, 2011," and were sent on December 1, 2011; (2) "Allscripts Paperless Year End," and were sent on December 5, 2011; and (3) "New Customer Appreciation Copy Paper Special," and were sent on January 6/7, 2010.

[Dkt. #204-1, at 3].

The three Class B faxes are faxes 22, 23, and 24 in Class A. Plaintiff explains that there are two classes because it has transmission logs for the three faxes in Class B, and invoices from Westfax, the company that defendants engaged to send faxes on its behalf, for the other 29. Westfax, the plaintiff tells us through the testimony of Westfax's president, only sends invoices for successful broadcasts. [Dkt. #204-1, at 6; #204-9 Clark Dep., at 28-29]. Mr. Clark testified that they bill their

10

customers by "successful page" and that the defendants received a "detailed report" "indicat[ing] whether or not each fax was successful or not . . . ." [Dkt. #204-9 Clark Dep., at 29-29]. The invoices reveal thousands of faxes were sent. For example, the very first invoice states that the broadcast quantity was 5,113. [Dkt. #204-5, at 2/257]. Plaintiff's calculations put the overall numbers at 134,357 for Class A and 17,781 for Class B. [Dkt. #215, at 13].

Defendants complain that the Westfax invoices don't indicate to whom the faxes were sent – that's true – which would seem like a strike against ascertainability. A class has to be clearly defined and based on objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). While some Circuits demand more, the Seventh Circuit has rejected any more stringent a requirement than that. *Id.* The defendants didn't keep records of their faxing, and the Seventh Circuit has explained that "refusing to certify on th[e] basis [of ascertainability] effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions." *Id.* at 668; *see also Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014)("Doing this – or declining to certify a class altogether, as defendants propose – would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct.").[7]

This is not to say that there will not be problems down the line, but they will be addressed to the extent allowed by the parties' submissions in the context of manageability. In the end, however, when a class is certified in junk fax cases, it's up to the plaintiff and class counsel to come

---

[7] There is nothing particularly new in the underlying theory. It is not in its ultimate purpose different than allowing a plaintiff in an overtime case from testifying from memory or his own records where the defendant allegedly kept no records. Any other rule, the Supreme Court has said, would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557 (1981).

up with details on management of the case or face decertification. *Mullins*, 795 F.3d at 664.

A class may be certified only if "the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51 (2011)(emphasis supplied). *Accord Montessori Learning Centers*, 662 F.3d at 916; *CE Design Ltd*, 637 F.3d at 723. It must be remembered that certification of class action can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit. That is because the TCPA makes violators strictly liable for "cumulatively very heavy statutory penalties," *CE Design Ltd*, 637 F.3d at 723, and "defendants may [consequently] well be forced – even if they have a strong case on the merits – to settle to avoid the risk of a catastrophic judgment." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).

Class certification requires the plaintiff to show, by a preponderance of the evidence, that four requirements of Fed.R.Civ.P. 23(a) are met:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
>
> (2) there are questions of law or fact common to the class (commonality);
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
>
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

Fed.R.Civ.P. 23(a); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016); *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). In addition to meeting these requirements, the class must satisfy one of the four conditions in Fed.R.Civ.P. 23(b). *Bell*, 800 F.3d at 373.

In this case, the plaintiff seeks certification under Fed.R.Civ.P. 23(b)(3), which applies to class actions when the purported class seeks monetary damages. The rule allows for class

12

certification when "questions of law or fact common to the class members predominate over any questions affecting individual members," and when a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *Bell*, 800 F.3d at 373. Predominance is similar to Rule 23(a)'s requirements for typicality and commonality, but the predominance criterion is far more demanding. *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017). The need for rigorous analysis of a motion to certify a class is for the protection not of the defendants alone, but of the class members as well. *CE Design Ltd.,* 637 F.3d at 723.

## A.
## Numerosity

There is no dispute that plaintiff satisfies the numerosity requirement. [Dkt. #215, at 14-16]. Defendants have admitted that they sent the 36 faxes plaintiff attached to their Complaint to the plaintiff's fax number. At the very least, the plaintiff's evidence – unchallenged by the defendants – shows that defendants sent faxes to over 17,000 fax numbers in Class B. [Dkt. #204-1, at 9]. Well over 100,000 faxes were sent in Class A. As such, even without an exact determination of size, "it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co.*, 747 F.3d at 492. Whether the class members actually have valid claims is a matter for another day. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).

## B.
## Commonality

The Supreme Court has explained that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'" at the hands of the same defendant.

*Wal–Mart Stores, Inc.,* 564 U.S. at 349–50; *McCaster*, 845 F.3d at 800. It's not enough for the plaintiffs to show that class members have all suffered a violation of the same provision of law." *Wal–Mart*, 564 U.S. at 350; *McCaster*, 845 F.3d at 800. "Instead they must show that 'the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members.'" *McCaster*, 845 F.3d at 800. Conduct common to members of the class is critical; the class members' claims must depend on a common contention that is "capable of classwide resolution." *Wal–Mart*, 564 U.S. at 350: *McCaster*, 845 F.3d at 800.

Class certification is common in TCPA litigation because the main questions, such as whether a given fax is an advertisement, are common to all recipients. *Turza*, 728 F.3d at 684. "[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do." *Wal–Mart*, 564 U.S. at 359. Here, the plaintiff submits there are four questions common to all fax recipients: whether the faxes are advertisements; whether each defendant is a sender, whether opt-out notices comply with 47 CFR §64.1200(a)(4)(iii); and whether the defendants willfully or knowingly violated the TCPA such that treble damages are available. [Dkt. #204-1, at 12]. In its reply brief, it adds the question of whether the FCC can grant a retroactive waiver of the opt-out notice requirement that applies to litigation between parties. The plaintiff submits that "[t]hese questions can be answered classwide, and doing so will resolve the entire case . . . ." [Dkt. #204-1, at 12].

While answering these questions will not resolve the entire case – there are the matters of express permission and established business relationship – those two points do not scuttle commonality. As already noted, just a single common question will suffice. *Wal-Mart*, 564 U.S. at 359. The questions plaintiff submits are clearly capable of classwide resolution. The recipients received the same faxes, and so the questions of whether the fax was an advertisement, who the

sender was, whether the fax contains a proper opt-out notice, are all common questions. The same is true of whether defendants acted intentionally and whether the defendants' waiver is applicable here.

The defendants do not really make a serious challenge to plaintiff's commonality showing. They argue that plaintiff's claims are not common to the class because plaintiff may not even have been the intended recipient of some of the faxes. *Brodsky v. HumanaDental Ins. Co.*, 2014 WL 2780089 (N.D.Ill. June 12, 2014). [Dkt. #215, at 15] is relied on. But oddly and inexplicably defendants overlooked the fact that *Brodsky* reconsidered its statement that a plaintiff could not recover unless he was the intended recipient of the fax. *See Brodsky v. HumanaDental Ins. Co.*, 2014 WL 4813147 (N.D. Ill. Sept. 29, 2014). In the wake of the Seventh Circuit's holding in *Chapman v. Wagener Equities, Inc.,* 747 F.3d 489, 491 (7th Cir. 2014), the district court determined that all that mattered was whether the plaintiff was the owner of the fax machine; whether the fax number was his. 2014 WL 4813417, at 3.

## C.
### Typicality

The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). Typicality requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to ligate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). "Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as

15

the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). Thus, where a representative's claim "involves facts that distinguish [the plaintiff's] claim from the claims of . . . fellow class members," typicality is lacking. *Muro*, 580 F.3d at 492.

Here, the plaintiff's claims are typical of the class. It received the enumerated, unwanted faxes from the defendants at its fax machine number. The claim is that the defendants acted the same way as to all putative class members. *See Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996)("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."). Defendants' only argument against typicality is the same one they raised against commonality: that other individuals were authorized to receive faxes at plaintiff's number. [Dkt. #215, at 15-16]. But that argument is unavailing, as it was in the context of commonality. As such, it is appropriate to move on the much more controversial issue of adequacy of representation. *See CE Design Ltd.*, 637 F.3d at 724–25 ("In light of the statement in *Wagner v. NutraSweet Co.,* ... that 'typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members, we'll focus our analysis on adequacy."). This is where the plaintiff motion for class certification runs aground.

### D.
### Adequacy of Representation

### 1.

Often, the requirement of typicality merges with the further requirement that the class representative "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4); *CE Design Ltd.*, 637 F.3d at 724–25; *Creative Montessori, supra*. In this case, there are some red

16

flags that require a close look. First, a plaintiff can't be an adequate representative of the class if the plaintiff is subject to a defense that couldn't be sustained against other class members. "'The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.'" *CE Design*, 637 F.3d at 726; *Koos v. First Nat. Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir. 1974)("Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative.").

Second, "[a] named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design*, 637 F.3d at 726. The credibility problem often bears on an issue in the case. *Id.* at 724 (credibility of testimony regarding consent arising from permission to publish his company's name and fax number in an industry "Blue Book" used to facilitate marketing among subscribers); *Schleicher v. Wendt*, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009)(Hamilton, J.)(". . . a criminal fraud conviction is extremely troubling for someone who seeks to serve as a fiduciary for absent class members asserting they are the victims of a fraudulent scheme."), *affirmed on other grounds*, 618 F.3d 679 (7th Cir.2010).

In *Creative Montessori, supra*, Judge Posner, speaking for a unanimous panel, rejected the notion that only the most egregious misconduct of counsel should require denial of class certification because of inadequate representation. 662 F.3d at 918-19. If taken literally, as the district judge in *Creative Montessori* did , it would condone unethical conduct and incentivize it. Thus, the panel held that once a major ethical violation had occurred, it should place on class counsel a heavy burden of showing that they are adequate representatives of the class. *Id.* at 919. The court held that while there

was reason to doubt that class counsel would adequately represent the class,[8] it returned the case to the district court to conduct the necessary review under the proper test.

This does not mean that defendants are invited "to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus un Rule 23(a)(3) and (4) on the interests of the class...." *CE Design Ltd.*, 637 F.3d at 728.   In this case, the plaintiff has serious credibility problems regarding the two defenses arguably in play: permission and established business relationship.[9] Even if a plaintiff denies the charges against it that denial alone does not settle the issues in its favor. Saying so doesn't make it so. *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). Here, the plaintiff was forced to admit the falsity of numerous interrogatory answers.

---

[8] The lawyer there was one of the lawyers in this case, in which he is the lead counsel, as he is in the rather large number of cases in which he has and is participating. *Creative Montessori*, 662 F.3d at 919.

[9] The Court of Appeals held in *CE Design*:

"testimony that [Mr. Pezl] was unaware that he had authorized publication of CE's fax number in the Blue Book is both difficult to credit, as the district judge acknowledged, and, if disbelieved, could be thought evidence of Pezl's fearing that the publication of CE's fax number could indeed be construed as permission to fax ads to that number. The legend "Contact Us" next to CE's fax number on the company's website could be thought to reinforce an inference of permission from the publication of the fax number in the Blue Book. ... And notice that the invitation or permission required by the statute for authorizing faxed ads may be "in writing or otherwise"—no specific form of invitation or permission is specified. The district judge did not give adequate consideration to the cumulative significance of Pezl's testimony, the publication of CE's fax number in the Blue Book, and its publication on CE's website, in ruling that CE was an adequate representative of the class." 637 F.3d at 726.

18

Indeed, judges are not obligated to abandon their common sense and ordinary human experiences when they come to the bench. *Cf. United States v Montoya De Hernandez*, 473 U.S. 531, 542 (1985); *Barclay v. Florida*, 469 U.S. 939, 950 (1983); *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989)(that fact finders may properly "'use their common sense'" and "'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.'"). Junk fax cases are not an exception to this rule. *See CE Design Ltd.*, 637 F.3d at 726 ("Pezl's testimony that he was unaware that he had authorized publication of CE's fax number in the Blue Book is both difficult to credit, as the district judge acknowledged and, if disbelieved, could be thought evidence of Pezl's fearing that the publication of CE's fax number could indeed be construed as permission to fax ads to that number.").

## 2.

We begin with plaintiff's discovery responses regarding the defense of an established business relationship. As it turns out, the responses were false. Even taken in a light most favorable to the plaintiff, the plaintiff was recklessly indifferent to the truth. Truthfulness in litigation, on a "key question" in the case is an "important issue in deciding whether [one] is a proper representative of the class...." *CE Design Ltd*, 637 F.3d at 724. *See also id.* at 725. "A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *Id*. at 726.

When requested to admit that it was a customer of defendants, the plaintiff denied it, and went on to assert – although not asked– it was a customer of Misys Healthcare System. [Dkt. #214-7, at 9]. That formulaic, unresponsive answer to the specific request was obviously intentional. For example, responding to the second set of requests to admit, when asked if it sent a fax to defendants

19

on March 27, 2009, the plaintiff's response was: Denied. But it did not end there. The plaintiff then went on to add, "Plaintiff was a customer of Misys Healthcare System." [Dkt. #214-8, at 3/9]. And, as we have said, it responded in this fashion regardless of the question. It did not matter if all that was asked was its fax number, its account number, or about order forms [Dkt. #214-8, at 3,5/9]. It gave the above premeditated, false answer. If the plaintiff is to be believed, the false answers were fashioned by the lawyers despite their lengthy experience representing the plaintiff in other cases (*see* n. 3) and despite the plaintiff's lawyers in this case, having admitted (on behalf of the same plaintiff in another case), that the plaintiff sold vitamins. Yet, for example, in the answer to the interrogatory about the sale of vitamins Dr. Ruch denied his company sold vitamins. Of course that was not true, and at the deposition, Dr. Ruch was forced to admit "[w]ell, we do for sure" sell vitamins. [Dkt. # 227, Ex. F at 192]. Even though he had to have known the answer (like so many others) was false, he gave the false answer under oath. Initially he testified that he read the answers that were given to him, as prepared by his lawyers supposedly without his input. [Dkt. 227-9 at 190]. When pressed by defense counsel, he claimed he didn't recall if he was supposed to confirm the facts to which he was sharing under oath. *Id.* After all, he said, he didn't know whose responsibility it was to do that. When that proved an unconvincing dodge and he was forced to concede that many of the answers to the interrogatories that he reviewed were false, he blithely sought to account for the falsity of many of the answers he ultimately admitted having reviewed, by saying said he just "didn't really think too much about it." [*Id.* at 205].

At his deposition, Dr. Elwert, one of plaintiff's principals, eventually conceded plaintiff had an account number with defendants, contradicting plaintiff's repeated and intentional discovery responses. [Dkt. #214-3, Elwert Dep. (11/10/2015), at 244]. He also conceded that he welcomed

faxes from defendants if they were "[o]n something transactional." [Dkt. #214-3, Elwert Dep. (11/102015), at 121]. An account number and transactions done by fax make it sound like plaintiff was a customer of the defendants – like the two had an "established business relationship."

The other of plaintiff's two principals, Dr. Ruch, was selected to be the plaintiff's Rule 30(b)(6) witness. He said that plaintiff let their attorneys answer discovery. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 190-191, 204]. Yet, the attorneys never consulted with Dr. Ruch or his colleagues, even though the answers were being prepared for their verified signature. In any event, the attorneys never denied what Dr. Ruch claimed. The doctor went on to explain that he and/or Dr. Elwert read the discovery responses after they were completed. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 191]. But they did not change any of the answers. As Ruch incredibly tried to say, he "really didn't think too much about it ... what they are." [Dkt. #227-9 11/06/15].

What an extraordinary statement by someone who, in essence, is a professional litigant in junk fax cases and, if true – and that is exceedingly unlikely – what a disregard of the truth and Dr. Ruch's obligations. If Dr. Ruch is telling the truth, it would not appear that plaintiff is directing the litigation, as it must, but rather is leaving it to the lawyers, with little regard for the truth and accuracy of what they do – or of what they say under oath. A plaintiff who seeks to be the class representative cannot simply shift its duties to class counsel. Nor, can putative class counsel's obligations be disregarded as cavalierly as did Dr. Ruch and Dr. Elwert. Figurehead plaintiffs are not permitted. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502–03 (S.D. Tex. 2004); *Silver v. LA Fitness Int'l, LLC*, 2013 WL 5429293, at *2 (E.D. Pa. 2013). And taking an active and honest and attentive and role in discovery is one of the hallmarks of an otherwise adequate class representative. *Id. See also Silver*, 2013 WL 5429293 at *2.

21

Dr. Ruch allowed the false answers to be filed and affirmed their truth even though the false answers related to his own company, thereby precluding any claim – and none is made – of inadvertence. Dr. Ruch absurdly claimed that he wasn't aware that it was his responsibility to correct untrue, sworn responses about his own company – and his own case – even though he knew they were false or even to tell his own lawyers that the answers he claimed the lawyers prepared were not true. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 191]. But if not his responsibility, whose was it? After all, they were his sworn answers about his company and his case that he caused to be brought in a federal court. He unconvincingly tried to say when asked whose responsibility was it – his or his lawyers to correct his false answers – he claimed not to have any "understanding on that." (Dr. Ruch Dep., 191). His attempted explanation – especially coming from an experienced litigant – is unacceptable. [Dkt. #214-7, at 8/9; #214-8, at 9/10; Dkt. #227-9, Ruch Dep. (11/06/2015), at 88-194, 205].[10]

Although said in a different context, Learned Hand's cogent observation applies here: "Justice is not a game...." *United States v. Paglia,* 190 F.2d 445, 448 (2nd Cir.1951). Unfortunately, Dr. Ruch was not a subscriber to this philosophy.

One who intentionally does not tell the truth about the case cannot be an effective class representative. *Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014)("If he was lying and actually thinks the case worthless how could he have been an effective class representative even if he had no conflict of interest?"); *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 505 (S.D.N.Y.

---

[10] For one, plaintiff "obviously" was a customer of the defendants and had some kind of business relationship with them. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 191].). And Dr. Ruch knew it was, as he admitted at his deposition. And his lawyers should have known it if they had bothered to go over the answers they (allegedly) prepared to the interrogatories. The reality simply is that telling the truth was not either in the lawyers' or the plaintiff's perceived interests.

1976)("If plaintiff's *eminence grise* Dr. Norman is lying about how he came to the attorneys, then it is an unfit class representative.").

The purpose of discovery is integral to the quest for truth and the fair adjudication of guilt or innocence. *Taylor v. Illinois*, 484 U.S. 400, 419, 430 (1988)(Brennan, J., dissenting). *See also Cassidy v. Cassidy*, 923 F.2d 856 (7th Cir. 1991)(the truth seeking process is perhaps court's most important function); *Trans-Cold Exp., Inc. v. Arrow Motor Transit, Inc*., 440 F.2d 1216, 1220 (7th Cir. 1971)(truth be better served by straightforward procedures than by deception and attempted surprise); *Babcock & Wilcox Co. v. Foster Wheeler Corp*., 432 F.2d 385, 388 (3rd Cir. 1970)/("the need for discovery as an aid in the quest for truth may be as compelling when a party submits his direct case as when he prepares to rebut his opponent's presentation."); *President & Fellows of Harvard Coll. v. Elmore*, 2016 WL 7508832, at *1 (D.N.M. 2016); *Echon v. Sackett*, 2016 WL 1732708, at *2 (D. Colo. 2016); *Kincaid v. Wells Fargo Sec., LLC*, 2012 WL 712111, at *1 (N.D. Okla. 2012)(Rule 26 seeks to find an appropriate balance between the truth-seeking goal of discovery and the purpose of the stated privilege); *Rodriguez v. Presbyterian Healthcare Servs.*, 2012 WL 12894833, at *14 (D.N.M. 2012)(truth-finding is the purpose of discovery); *Duplan Corp. v. Deering Milliken, Inc.*, 370 F. Supp. 761, 767 (D.S.C. 1972)(the search for truth is the object of all process including discovery). *See also* Fed.R.Civ.P. 1. (requiring that *all* federal rules of civil procedure be interpreted to secure the "just" resolution of civil litigation).[11]

---

[11] Truthful responses in discovery are necessary lest we return to what Wigmore aptly called trial by ambush. *Cf., United States v. Proctor & Gamble Co.*, 356 U.S. 677, (1958); *Hickman v. Taylor*, 329 U.S. 495, 500(1947), See *Dollar v. Long Mfg., N.C., Inc*., 561 F.2d 613, 616 (5th Cir. 1977); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 31 (1st Cir. 2001); *E. Maico Distributors, Inc. v. Maico-Fahrzeugfabrik, G.m.b.H.*, 658 F.2d 944, 947 (3rd Cir. 1981); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1345–46 (5th Cir.1978); *Shakespear v. Wal-Mart Stores, Inc.*, 2013 WL continue...

Far too many of the responses in this case did not fulfill the basic purposes of discovery. Indeed, they were antagonistic to them. Courts have repeatedly emphasized the importance of class representatives having reviewed court papers prior to filing, answering interrogatories (obviously in a truthful way), conferring with attorneys about the prosecution of the action, understanding the facts of the case are among their responsibilities as proposed class representatives. *See Lehocky*, 220 F.R.D. at 503; *Silver*, 213 WL 5429293 at *2; *Norman*, 72 F.R.D. at 505. To accept the feeble attempt to explain what was purposely done here would require that we abandon our common sense and ignore what this record reveals. That we cannot do and still be faithful to the need that discovery be answered truthfully and that there be "rigorous" analysis of the factors that go into the approval of class representative.

The plaintiff has similar credibility problems regarding the merits-based issue of who had authority to consent to – or, more accurately, provide permission for – faxes to be received. When asked to admit that multiple staff members and physicians had the authority to grant permission to businesses to send plaintiff faxes, the plaintiff denied the statement, saying, curiously, that "[o]nly Dr. Ruch and Dr. Elwert had permission to *send* facsimiles." [Dkt. #214-7, at 4-5] (emphasis supplied). That's not even responsive to the request, as Dr. Ruch conceded at his deposition. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 194]. But, more importantly, it's not true. As Dr. Ruch conceded, he should have admitted that assertion. [Dkt. #Ruch Dep. (11/06/2015), at 194]. But he did not.

---

[11]...continue
6498898, at *4 (D. Nev. 2013). *Millsap v. McDonnell Douglas Corp.*, 162 F. Supp. 2d 1262, 1287 (N.D. Okla. 2001); *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 108–09 (D. Md. 1989).

If only his lawyers had thought to consult with him. Oh, but he said he saw the responses after they were prepared by counsel. But he did not change them. Nor did he even tell the lawyers of the falsities. It is nonsensical to think he would have done nothing and let the false statements go out under his verified signature. Plaintiff is, after all, "a professional class-action plaintiff who regularly works with [Law Firm of] Anderson & Wanca to file TCPA cases," *Physicians Healthsource, Inc.* 2014 WL 7366255, at *7, and Dr. Ruch is no stranger to participation in these cases.

"The mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity." *Avery v. Georgia*, 345 U.S. 559, 564 (1953). *See Coggeshall v. United States,* 69 U.S. 383 (1865)("Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."); *United States v. Rodriguez*, 975 F.2d 404 (7th Cir. 1992)("In isolation, any one of the facts described in the Government proffers might conceivably be dismissed as mere coincidence. Considering the proposed evidence in total, it more than represents the sort of suspicious circumstances that convince us.…").

At worst, perjury has been committed. That's certainly a serious credibility problem – and one that pertains directly to the facts of the case – which counsels against finding the plaintiff an adequate class representative.[12]  At best (and this is unlikely), one or both of the doctors are merely lackadaisical participants in this litigation, who "don't really think too much" about their responsibility to give truthful answers in discovery – even though the questions and answers related

---

[12] It bears repeating that the focus here is not on general credibility which leads to a further concern about the witness's credibility in his testimony relating to the case. To the contrary, the credibility concerns raised here go directly to the facts of the case that the plaintiff has brought.

to the operation of their own company and their own case. But that explanation is unacceptable. False answers to simple questions were given not because of mistake or uncertainty, but because the Doctors thought it was helpful to their case to do so. Either way, the plaintiff is not an appropriate representative of the class their lawyers are attempting to have certified.

Perjury is a serious matter. "The legal system offers many ways to deal with problems; perjury is not among them." *Escamilla v. Jungwirth,* 426 F.3d 868, 870 (7th Cir.2005). And in "matters of discretion" a litigant that attempts to deceive the court "cannot expect favorable treatment...." *Campbell v. Clarke,* 481 F.3d 967, 969 (7th Cir. 2007). It cynically might be said that one willing to lie about multiple points in a case to push the cause forward – or was indifferent to matters that adversely affected him and the company he represented – is, in a twisted way, a rather zealous representative, although a dishonest one, and that is a disqualifier. It (or he) is just not a representative that a court can countenance. And lying about matters that relate to the case, itself – such as not telling the truth in discovery – is a disqualifier. *See* cases cited at 23 *supra.; Eubank*, 753 F.3d at 724 ("If he was lying and actually thinks the case worthless how could he have been an effective class representative even if he had no conflict of interest?").

This overview of the plaintiff's impermissible gamesmanship in discovery, which is not allowed*, Dillon v. BMO Harris Bank, N.A.*, 2015 WL 6619972, at *2 (M.D.N.C. 2015); *see* cases at n. 11, *supra,* scuttles what the plaintiff touts as its main selling point as a class representative: that it has been a plaintiff in many cases. That it has been is further proof that its present claims about its conduct in this case ares unpersuasive. It is not a newcomer to the process (far from it) and cannot possess so cavalier an attitude to its responsibilities in litigation – responsibilities which lie at the core of our system of truth-seeking. Parties must engage in discovery in good faith, without

gamesmanship,

Given what has been done by the plaintiff thus far in this case, it is difficult to give any credence to the argument that plaintiff "'may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions.'" [Dkt. #204-1, at 14 (quoting *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006))]. If Drs. Ruch and Elwert aren't even verifying the accuracy of their verified discovery responses – and that is the only realistic conclusion to be drawn – there can be no assurance of monitoring of counsel by them. Nor – and this is of even greater importance – can there be the assurance that the class representative will attempt to be truthful in this case. Such a class representative is plainly insufficient – just a place-holder for the attorneys driving the case. In short, experience is not decisive.

The same is true of its experienced lawyers. It should be noted parenthetically that acceptance of the testimony the plaintiff has offered makes the lawyers less than desirable representatives in this case since they allegedly did not consult in advance with their clients about answers to interrogatories and did not consult with them even after they allegedly prepared the answers but before they were filed. It is tantamount to a doctor letting his patient make a diagnosis and then not even consulting with him about the validity and accuracy of what the plaintiff thought. As such, the experience factor of the lawyers has vastly diminished significance in the adequacy analysis and cuts against a finding of adequacy of representation in this case. One is reminded of Judge Easterbrook's observation in *Blue Cross & Blue Shield Ass'n v. Am. Express Co.*, 467 F.3d 634, 638 (7th Cir. 2006), "[i]f these lawyers were physicians, their patients would be dead."

To support its claim of adequacy, plaintiff submits that it (and its officers) had to answer a lot of discovery and sit for depositions in Chicago. It also notes that the defendants filed a

27

counterclaim against it that was dismissed and sent to arbitration in North Carolina – yet another "burden" claimed by plaintiff. [Dkt. #204-1, at 15]. Neither argument suffices to make the plaintiff an adequate class representative. As all the courts have held, and as the Federal Rules of Civil Procedure inherently demand, honest and responsive participation in discovery is required of everyone who brings suit or is sued. *See* cases *supra* at 23. The fact that plaintiff is subject to the rule that govern all litigants is not enough to ensure that the applicant is qualified to be the class representative. The fact that the doctors had to travel to Chicago for depositions was a result of their desire that the plaintiff be the class representative, and the need to be deposed in Chicago resulted from their choice of Chicago as the forum for their suit, rather than the Southern District of Ohio in Cincinnati, where the plaintiff's business is located. *See* 28 USC §1391(b). It was also probably a nod to the fact that its chosen Law Firm, with which it has an ongoing relationship, was in Chicago.[13] And if filing sworn answers in discovery is a matter that the plaintiff's representative did not give much thought to – as Dr. Ruch claimed under oath – then there is insufficient assurance that the plaintiff will be an adequate class representative.

The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence. *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015); *Meissner v. North Shore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012). The evidence here all runs counter to the plaintiff being an adequate representative. The plaintiff's principals either lied, or were indifferent to their responsibilities as

---

[13] The plaintiff, it was claimed, may have breached its software agreement by subleasing the software, and defendants filed a counterclaim about it; but it was *the plaintiff* who argued that the claim had to be arbitrated in North Carolina pursuant to a clause in the contract. [Dkt. #144, at 3]. Again, as with venue here, this was plaintiff's conscious choice.

a class representative, or both. "If the party certification fails to meet any of the[ ] four requirements [in Rule 23], class certification is precluded." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893 (7th Cir. 2012). The plaintiff's motion to certify the class must be denied.

## E.
## The Defendants' Counterclaim

As already noted, the defendants filed a counterclaim, alleging that the plaintiff breached a software agreement by sublicensing the software to a former employee, Geri Monhollen. That counterclaim claim was dismissed for improper venue owing to an arbitration clause in the software agreement, and went to arbitration in North Carolina. The substantive question for the arbitration was whether the plaintiff sublicensed the software to a former employee.

It's worth noting, to underscore the plaintiff's attitude towards the proper responsibilities of participating in discovery, that throughout discovery, the plaintiff denied that it sublicensed the software and denied the point in its response to the defendants' Local Rule 56.1 statement of facts. [Dkt. #271, ¶¶ 37, 38]. Four years into this case, plaintiff produced the very sublicense it claimed in discovery did not exist. [Dkt. #274-2].

Also of concern is the deal Dr. Ruch said that he had made with Montgomery, Rennie & Johnson, which is representing the plaintiff both here and in the arbitration proceedings. According to Dr. Ruch, he and the Firm had agreed that any *damages* plaintiff might incur in the arbitration proceeding would be taken out of settlement proceeds in the class action, as would any fees due counsel for its representation of the plaintiff in the arbitration. [Dkt. #227-22, Ruch Dep., at 84-85]. Thus, the plaintiff swore that one of his class action Law Firms and the plaintiff had put the class on the hook for a benefit that inured solely to the plaintiff, further undermining plaintiff's adequacy as

29

class representative. In *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 725 (7th Cir. 2016), the Seventh Circuit said: "'A class representative who proposes that high transaction costs (notice and attorneys' fees) be incurred at the class members' expense to obtain [no benefit to the class] ... is not adequately protecting the class members' interests.'" (Parentheses and brackets in original).

An attorney for the Montgomery Firm, Matthew Stubbs, has filed a terse declaration in this case, consisting of four, 1 or 2 sentence paragraphs, spanning a mere 1 1/4 pages.[14]  Paragraph 4 consists of one conclusory sentence stating that the Montgomery, Rennie & Johnson Firm "*has no agreement with PHI* to pay any liability that PHI incurs as a result of the arbitration claims." (Emphasis supplied). But that is not responsive to what Dr. Ruch contended. He said that he *had* an agreement any *damage*s would be paid out of the *class recovery,* and that is very different than what the Montgomery Rennie declaration states. Thus, Dr. Ruch's allegation in this regard stands unrebutted and undenied. While inferences from silence can be perilous, the declaration's failure to deny (or even mention) Dr. Ruch's assertion that he *had* an agreement with his lawyers that *any damages* would be paid out of the class settlement is significant. *See Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008)(Posner, J.)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").[15] And, it could not be accidental given the skill and experience of the preparer of the Montgomery Rennie declaration.

---

[14] The fifth paragraph is a single sentence declaring under penalties of perjury that the statements in the Declaration are true and correct. Dr. Ruch said at his deposition he did not know Mr. Stubbs' hourly rate, and that he got no monthly invoices from the firm. Dr. Ruch and thus the plaintiff apparently were unconcerned about the amount of fees they might owe one of the firms that is seeking to be class counsel in the instant case.

[15] *See also* Jean Edward Smith, John Marshall: Definer of a Nation (1996) ("More than five weeks have elapsed since the Supreme Court declared the necessity of proving the fact, if it exists. Why is it not proved? Chief Justice Marshall said he could not assume that the government was remiss in seeking the proof; the only conclusion was that the evidence did not exist.").

So in other words, if Dr. Ruch is telling the truth about the prior existence and the source of payment of *damages*, the class would not be represented by counsel or a class representative having the candor and disinterestedness that the law requires. If Dr. Ruch is not telling the truth, and there *was* no such deal– a matter on which the Stubbs declaration is silent (it speaks only to the present) – it is obvious that his Firm is not an adequate class counsel. If he is telling the truth and his lawyers assured him that any arbitration award against the plaintiff would come out of the class recovery, the lawyers cannot be deemed to be adequate class counsel.

The plaintiff contends that, because the arbitrator's award went in its favor and defendants have to pay fees and costs, the point is moot. [Dkt. #291]. But it most certainly is not. The question is whether such a deal was made at all, as the plaintiff insists, or it was not, as one of the lawyers' declarations asserts. Either way, it bodes ill for the plaintiff for the reasons we have discussed. Either the lawyer is not telling the truth and there was a deal about damages, or the plaintiff is not telling the truth and there no such arrangement – or at least not the one attributed to the lawyers. In either event, when combined with everything else that this record demonstrates has occurred, the plaintiff should not be the class representative.

Adequacy of counsel is the other part of this analysis; but without an adequate class representative or certified class, it is an academic exercise here – but a worthwhile one, as this may not be the last certification motion in this case. Counsel for a certified class is appointed by the judge presiding over the class action, and in deciding to appoint a lawyer to be class counsel the court "may consider," besides the lawyer's competence, experience, related professional qualifications, "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(B), (g)(4); *Eubank*, 753 F.3d at 724; *Reliable Money*

*Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498–99 (7th Cir. 2013).

Here, the plaintiff has a battalion of lawyers representing it in its junk fax case: 13 lawyers from four different Law Firms located in four different cities in three different states. Three of those Firms are proposed as co-class counsel: Andersen & Wanca; Bock & Hatch; and Montgomery, Rennie & Jonson. In making their case for adequacy, the Firms, *in one conclusory paragraph*, focus on experience. They assert they have done many junk fax class action cases and have been found adequate in the past. So why not now, they argue? Prior engagement is a factor in their favor, but it is not conclusive or Rule 23 and the cases would say so. They don't. Indeed, they hold that experience alone is not the decisive factor – although it is a factor. But each case is necessarily different and presents different facts that must be considered.

The conclusory, single paragraph in the plaintiff's brief ignores the requirement that counsel must prove their entitlement to be class counsel, and there must be a "rigorous" analysis of their claimed entitlement. Experience alone is never decisive.

The cases cited in plaintiff's brief are not exactly informative or helpful, for courts routinely refuse to be bound by or even consider cases that arrive at conclusions without meaningful analysis. *See, e.g., E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 764 (7th Cir. 2012) (rejecting opinion for lack of analysis); and *Szmaj v. Am. Tel. & Tel. Co.*, 291 F.3d 955, 956 (7th Cir. 2002)(the cited case provided at best only "weak authority" because there is no discussion of the point, only a conclusion). In these cases, counsel's adequacy was either unchallenged, *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324, at *6 (N.D. Ill. Aug. 20, 2009); unaddressed, *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 895 (N.D. Ill. 2010); or accepted without any analysis in the opinion – let alone the "rigorous analysis" the law requires. *See, e.g., CE*

*Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009); *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008).[16]

In *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *6 (S.D. Fla. Dec. 24, 2014), the court noted that the Firm of Andersen & Wanca "is one of very few Firms that specialize in TCPA class actions." That hardly seems to be the case, as there are three such Firms in this litigation alone, and TCPA class actions are, again, a growing cottage industry. Linetsky, *supra* at 6, 90 Neb. L.Rev. at 94-97.

Still, there's no denying these three Firms do a large volume of junk fax cases. But, given that experience, one wonders how three such Firms and a dozen veteran TCPA attorneys of record could have allowed discovery to proceed as it appears to have proceeded thus far. They have had great and repeated difficulties meeting deadlines and seemingly have no sense that they will fail to meet a deadline until the eleventh hour, among other difficulties. [*See, e.g,* Dkt. ##189, 234, 260, 270].

They have experienced similar difficulties with page limitations, supposedly not realizing until the last minute that they might need as much as 40% increase, despite having the defendants' submissions for two months in one instance and nearly as long in another. [Dkt. #235, #252]. Surely an adequate representative, well-schooled in this type of litigation, doesn't leave everything until the last minute or until it's too late. Untimely or delayed requests for continuances and continuances by default are not favored and often disallowed.[17] Perhaps experience in this case is being trumped by

---

[16] *See also*, *Sandifer v. U.S. Steel Corp.* 678 F.3d 590 (7th Cir.2012); *Bogan v,. City of Chicago*, 644 F.3d 563 (7th Cir. 2011); *Sottoriva v. Claps*, 617 F.3d 971, 976 (7th Cir.2010); *Prod. & Maint. Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1405 (7th Cir.1992); *Hileman v. City of Dallas*, 115 F.3d 352, 355 n. 4 (5th Cir.1997) (weak authority, because there is no discussion of the point, only a conclusion).

[17] Indeed, the courts have been critical of frequently late extension requests and compliance that continue...

the volume of business these Law Firms handle. But if that's the case, their behavior raises serious questions about whether they are an adequate representative for the class in this case.

There is but a single terse paragraph in the plaintiff's brief designed to show the adequacy of class counsel. It ends with this: "Plaintiff's counsel have committed significant resources to this case to ensure the classes are well represented." (Dkt. 204-1 at 16]. To say that counsel have devoted significant resources and therefore they are adequate and should be approved as class counsel is uninformative and impermissibly conclusory. How much time and resources have been devoted, and what the resources consist of, the conclusion does not say or even attempt to explain. If the resources consist of briefing this case, that is also not enough or everyone would qualify merely by participating in the case. Finally, statements in lawyers' briefs unsupported by evidence are valueless and will not be considered. *See Perry v. Sullivan,* 207 F.3d 379, 383 (7th Cir.2000); *United States v. Cusimano,* 148 F.3d 824, 828 n. 2 (7th Cir.1998); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). Indeed, arguments that they are designed to support are generally deemed waived. *Blow v. Bijora,* _F.3d_, 2017 WL 1731494, *9 (7th Cir. 2017); *Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783-784 (7th Cir. 2014).

Beyond the above,  it is disconcerting that two of the Firms in this case have been singled out by courts for their behavior. *See Reliable Money Order*, 704 F.3d at 496–97 (collecting cases); *Creative Montessori Learning Centers*, 662 F.3d at 917 ("class counsel have demonstrated a lack

---

[17]...continue

requires continuation of discovery. *See, e.g., Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)("Disclosures must not be used as a means to extend a discovery deadline."); *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320 (5th Cir. 1998); *Finwall v. City of Chicago*, 239 F.R.D. 494, 502 (N.D. Ill. 2006); *City of Grass Valley v. Newmont Mining Corp.*, 2007 WL 210516 at *2 (E.D. Cal., Jan. 26, 2007).

of integrity that casts serious doubt on their trustworthiness as representatives of the class. Fed.R.Civ.P. 23(a)(4), (g). There is no basis for confidence that they would prosecute the case in the interest of the class, of which they are the fiduciaries.").[18]  The courts examining the Firm's behavior have generally not found it sufficient for disqualification, because the conduct did not prejudice the class or sufficiently jeopardize the integrity of the judicial process.  *See, e.g., Creative Montessori Learning Ctr. v. Ashford Gear, LLC*, No. 09 C 3963, 2012 WL 3961307, at *2 (N.D. Ill. Sept. 10, 2012), *on remand from the Seventh Circuit* ("Despite the abundance of information presented by

---

[18] The mandatory "rigorous" analysis in class action cases necessitates review of the proposed counsel in this case. Andersen and Wanca is one of those Firms with scores of junk fax cases pending at all times.  As part of the discovery process in four such cases, the Firm hoped to get records of recipients from a third-party fax broadcaster.  The Firm ultimately obtained possession of a hard drive with the information it desired and promised the provider/broadcaster that the names would be used for a very limited purpose, an he was assured by the Firm that all would be done in a perfectly lawful way and that the names being provided would not be misused for any other purpose beyond litigation.

The promise proved illusory and the disk provided the Firm with the names that were ultimately used for solicitation of class members in a separate suit which had not yet been initiated, but soon was. The Firm later used the disk to provide it with a mailing list to future class members and new suits were initiated that would not have been brought had the Firm not misled the provider of the disk. Indeed, because of its misrepresentations to the provider of the disk, the Firm was able to file over 100 junk fax class actions. *See Reliable Money*, 704 F.3d at 490-94. Bock and Hatch was involved in this strategy as well and used the roster of recipients in the same way. 662 F.3d at 916.

In the wake of two appeals in which it was called upon to discuss the asserted unethical conduct of these Firms, the Seventh Circuit indicated that discipline, through denial of class certification based on inadequacy of representation, was none of the courts' business, unless an ethical breach prejudiced an attorney's client or undermined the integrity of the judicial proceedings. That should be left to state bar authorities and disciplinary proceedings. *Reliable Money Order*, 704 F.3 at 502.

Assuming fee amounts comparable to the figure in *Geismann v. Allscripts-Misy's Healthcare Solutions, Inc.,* 09 CV 5114, settlements in just half of those cases would reap a $30 million windfall for the Firms.  As counsel for the defendants put it in *Reliable Money Order*, the court looking the other way would seem only to incentivize and reward overly aggressive and unethical attorney conduct. *Reliable Money Order*, 704 F.3d at 502. Be that as it may, here we have conduct that is not merely claimed to be potentially unethical, but conduct that meets the Seventh Circuit's standard of misconduct that "jeopardizes the court's ability to reach a just and proper outcome in the case." *Reliable Money Order*, 704 F.3d at 499. As all the courts have held, if discovery is not conducted honestly there can be no assurance in the "just[ness]" of the proceeding and its outcome. *See* Fed.R.Civ.P. 1.

defendants, nothing suggests to this court that class counsel will do anything but zealously represent the class, as they have in other TCPA cases before this court.").

The Seventh Circuit has explained that "[n]ot any ethical breach justifies the grave option of denying class certification . . [but] "misconduct that prejudices the class or creates a direct conflict between counsel and the class [does]." *Reliable Money Order*, 704 F.3d at 498. Importantly, the court went on to say that it did not mean "that only misconduct directly harming the class is relevant to the class certification decision." *Id.* "'[S]erious" or 'major' ethical violations – not prejudicial to the class—can require denial of class certification" when such misconduct "jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.* at 499. The Seventh Circuit cited with approval the denial of class certification in *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510–11 (N.D.Ill.1990) as an example of a situation where misconduct not prejudicing the class nevertheless jeopardized the integrity of the judicial process. In that case, the court denied class certification where the attorney failed to correct a witness's false deposition testimony despite knowing it was false. 132 F.R.D. at 510-11; *Reliable Money Order*, 704 F.3d at 499.

It would certainly appear that the same basic type of conduct is at work in this case. Dr. Ruch claimed that he knew that many of his sworn answers on the interrogatories were wrong, but that he did nothing about them, thereby allowing them to pass for the truth. Indeed, he blames the lawyers for the untrue answers – even though he admitted to having read the answers before the interrogatories were filed. His excuse was he just didn't think about it. But I do not credit his excuse. What was the point of his admitted review, if not to correct errors? It seems clear that either he was consciously lying or was indifferent to the truth if he thought a lie was more helpful to his case. This is not what an adequate class representative should be.

36

As we have said, it is difficult to see how the lawyers could have inadvertently made a mistake in light of their prior representations of the plaintiff, and it is unlikely, to say the least, that in preparing Dr. Ruch for his 30(b)(6) deposition, the lawyers did not review the interrogatory answers with him and thus learned of their falsity. Consequently, if they didn't already know the truth, they must have learned it in advance of the 30(b)(6) deposition. Or else, they did not properly prepare Dr. Ruch or he continued to withhold the truth from them. Yet, so far as the record reveals, neither the lawyers nor Dr. Ruch did anything to let the other side know that the answers were untrue. It was not until the defense lawyers conducted their cross-examination of Dr. Ruch that they learned that the interrogatory answers were false in many particulars. In fact, had there been no inquiry by the defendants, it appears that Dr. Ruch was content to let the false answers stand.[19]

In sum, if counsel answered the interrogatories without consulting with plaintiff, that's certainly poor lawyering (if not unethical behavior), and certainly "jeopardizes the court's ability to reach a just and proper outcome in the case." If counsel made good faith mistakes in their initial answers for Dr. Ruch, the plaintiff had an undeniable obligation either to correct the errors or to at least call them to counsel's attention before responses were filed. That is but a matter of common sense. It did neither. If the lawyers had knowledge of the truth from the beginning, they cannot be class counsel. And if they didn't know and didn't bother to talk to Dr. Ruch before the answers were filed, they simply cannot be counted on to be an adequate class counsel.

---

[19] All plaintiff will say about the false discovery responses is that it has "addressed" these "unfounded allegations." [Dkt. 238 at 6]. But the answers are demonstrably and concededly false. The only allegations that are unfounded are those made by the plaintiff. As for the plaintiff addressing the falsity, it does not indicate where in the hundreds of pages it has filed it has not done so. *See United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) *511 ("Judges are not like pigs, hunting for truffles buried in briefs.").

**F.**
**The Offer of Judgment**

There's also the issue of whether counsel ever conveyed the defendants' offer of judgment to plaintiff. The defendants made a Fed.R.Civ.P. 68 offer of judgment in this case – $1500 per fax, the most damages recoverable by the plaintiff. But Dr. Ruch says he has no recollection of ever seeing any offer or being told about it. Surely a knowledgeable and highly experienced class action lawyer would tell the plaintiff that an offer had been made. Or perhaps it simply slipped his mind. Or perhaps Dr. Ruch is not telling the truth, and he was told. In any event he said the first time he ever saw the offer was at his 2015 deposition. [Dkt. #227-9, Ruch Dep. (11/06/2015), at 19-29].

With three dozen faxes at issue, the offer totaled over $50,000. That seems a substantial amount – especially one that a lawyer would communicate to his client by email, if not by phone, and there would be some discussion about it, likely to leave an impression on the client. As Dr. Ruch admitted, it was important to him to settle the case, [Dkt. #227-22, Ruch Dep. (2/10/2016), at 67-68], and therefore, it seems odd that the doctor would forget about so significant a capitulation by the defendant involving a $50,000 settlement offer. Of course it's possible, but if important things like this don't sufficiently get his attention and cause him to act and to remember, how is he an adequate class representative? And if he is willing to let a substantial offer like $50,000 go by the boards – and not even recall it – one may fairly ask whether he is not really seeking to further the financial interest of the lawyers and thus by definition the plaintiff would not be an adequate class representative. It beatrs repeating that Ruch claims not to recall whether his lawyers sent him the answers to discovery for his review. That claim is not acceptable. In any event, he conceded he reviewed them and found a number of important errors. But he choose not to correct their falsity. As

he incredibly tried to say, he gave the truth or falsity of the answers little or no thought. I find that testimony untrue and intentionally evasive and it goes to the issues in this case.

Plaintiff's counsel insist that Dr. Ruch was told about the offer of judgment. Plaintiff's corporate counsel, John Lowry, has filed a declaration countering Dr. Ruch's testimony, stating that he communicated the May 2012 offer to Dr. Ruch, and that Dr. Ruch rejected it. He says he then informed class counsel of the rejection. [Dkt. #238-3]. Attorney Lowry attaches no documentation to his declaration, nothing like an email one might expect from experienced counsel. If Dr. Ruch is telling the truth and he has no recollection of it because the offer was not communicated to him, counsel is to blame and cannot be thought to be adequate. Failure to have informed Dr. Ruch would be in furtherance of the lawyers' interests, not the plaintiff's. In any event, the fact that counsel, both corporate and class, has had to repeatedly contradict the testimony of their client serves to underscore the plaintiff's inadequacies as a representative. On this record, it cannot be said that the plaintiff has shown by a preponderance of the evidence that he and/or counsel are adequate representatives in this case.

## G.
## Predominance

The next issue to consider is whether "questions of law or fact common to the class members predominate over any questions affecting individual members" and whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *Bell*, 800 F.3d at 373. These are demanding criteria. *McCaster*, 845 F.3d at 800. The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997).

39

Courts must give careful scrutiny to the relationship between common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, – U.S. –, –, 136 S. Ct. 1036, 1045 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where "the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* at 1045(quotations omitted).

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quotations omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (quotations omitted).

It has already been shown that there are a number of issues or questions common to all putative class members. The defendants contend that "individualized issues of consent" predominate. [Dkt. #215, at 19]. That argument, if accurate, would make cases like this unfit for class resolution, and that is not how Circuits around the country have ruled. In any event, "consent" isn't an issue; express permission is. That's not logomachy; the two are very different. Throughout the law, consent may be express or implied. *See, e.g., Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015); *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010); *Hunter v. Amin*, 583 F.3d 486, 492 (7th Cir. 2009). But in this instance, by definition, "permission" must be "expressed." 47 U.S.C. §227(a)(5). There is no avenue for obtaining implied permission or invitation based on the circumstances or conduct or whatever.

The Federal Communications Commission's rules implementing the TCPA and the Junk Fax Prevention Act make this quite clear:

> In the absence of an [established business relationship[20]], the sender must obtain the prior express invitation or permission from the consumer before sending the facsimile advertisement. Prior express invitation or permission may be given by oral or written means, including electronic methods. The Commission expects that written permission will take many forms, including e-mail, facsimile, and internet form. Whether given orally or in writing, prior express invitation or permission must be express, must be given prior to the sending of any facsimile advertisements, and must include the facsimile number to which such advertisements may be sent. It cannot be in the form of a "negative option."

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967-01, 25972, 2006 WL 1151584. The Rules go on to express concern that, since permission may be obtained orally, senders might falsely submit that they had received permission to send a fax. Thus, the Rules warn senders that if they choose to obtain permission orally, they must take reasonable steps to ensure that permission can be verified, such as by promptly documenting it. *Id.*

It's clear from the materials the defendants have submitted on this point that they are using the term "consent" advisedly – and tendentiously – and not as a convenient shorthand for express permission or invitation. For example, the defendants submit the declarations of nine "absent proposed class members identified from the BFX reports for Class B who swear that they . . . consented to receive fax ads from [defendant]." [Dkt. #215, at 20]. Aside from portions in which the declarants identify themselves, the Declarations are essentially identical. Each declarant states

---

[20] Arguably, the established business relationship defense provides an avenue to show implied permission. But, for the purposes of this motion and the defendants' motion for summary judgment, which the defendants have insisted on combining [Dkt. #224], the defendants chose to paint themselves into a corner and abandon any defense based on an established business relationship.

41

that:

> I do not specifically remember receiving any particular faxes from [defendants] promoting its products or services but, in general, I have consented to receiving such communications from [defendants] and others, in the past and currently as well.

[Dkt. #227-30].

So, not one of these declarants can testify that they provided *express* permission to the defendants to send them faxes. They claim they consented in general, but we don't know how they "consented." Maybe it wasn't expressed orally or in writing. They don't even have any recollection of receiving any faxes from the defendants. We don't know what the declarants consider "consent," so there is no way to know whether any purported "consent" qualified as express permission under the Act. The declarations are essentially meaningless; they are nothing but legal conclusions and do not answer the questions posed by this case – as those who prepared the declarations must have known.

The defendants also point to an additional number of declarations they submitted on this point in *Physicians Healthsource, Inc. v. A-S Medication Services, Inc.*, 12-cv-5150 (N.D.Ill.). Again, all these declarations discuss "consent," not "express permission," and do not reveal the meaning of the term as used by the declarant or the specifics about how "consent" was provided. Indeed, if defendants are correct that these declarations were submitted in *Physicians Healthsource, Inc. v. A-S Medication Services, Inc.*, 12-cv-5150 (N.D.Ill.), Judge Gottschall didn't think much of them. She held that the declarations did not constitute "evidence . . . that Allscripts obtained permission or, if it did obtain permission, the manner in which it obtained permission." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 2016 WL 5390952, at *10 (N.D. Ill. Sept. 27, 2016).

Both groups of declarants may have, as they say, appreciated receiving faxes from defendants, but that's not the same as express permission. Judges in this district have rejected this type of evidence as failing to address the real issue: express permission. *See, e.g. Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 226 (N.D. Ill. 2016)(incorrect to "equate[] appreciating [defendants'] calls with the legally significant issue of whether recipients provided prior express consent to receive the calls. The TCPA does not carve an exception for unlawful calls that are welcomed by the recipient."); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492 (N.D. Ill. 2015)("The problem with these objections is that they incorrectly equate appreciating [defendants'] . . . calls or declining to opt out of receiving them with the issue of legal significance, namely, whether recipients provided prior express consent to receive prerecorded phone calls.").

Even if these few declarations amounted to what the defendants would like, it would still not be enough to scuttle class certification. Significantly, the cases defendants rely on – as defendants concede – require *specific* evidence from the sender that the sender received express permission. *See Chapman v. First Index, Inc.*, 2014 WL 840565, at 3 (N.D. Ill. Mar. 4, 2014); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 WL 248511, at 1, 9 (N.D. Ill. Jan. 25, 2011). In fact, in *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013), the court distilled a number of cases to find "that issues of individualized consent predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented . . . ." *Id.* at 106-07. *See also Mauer v. Am. Intercontinental Univ., Inc.*, 2016 WL 4698665, at *4 (N.D. Ill. Sept. 8, 2016)("Issues of individualized consent typically predominate when a defendant sets forth specific evidence showing consent from a large percentage of potential class members and the plaintiff has not presented a method by which to ascertain consent on a class-wide basis."); *Johnson v. Yahoo!, Inc.*, 2016 WL

25711, at *7 (N.D. Ill. Jan. 4, 2016)(same). The declarations here are neither specific nor do they represent a significant percentage of the putative class.

Aside from that, defendants point to the testimony of Brian Moffett, whom they conclusorily call their "corporate representative" – his actual position is not identified in any way. [Dkt. #215, at 5]. Mr. Moffett testified he would always tell his staff to get permission to send a fax, although there was no written policy to that effect and no proof that his instructions were always or even generally followed. Indeed, when the defendants responded to the plaintiff's first requests to admit, they "denie[d] that [they] maintain[ed] a record of persons who provided express consent to receive advertisements by facsimile transmission." [Dkt. # 238-7, ¶ 12].[21] Moreover, Mr. Moffett doesn't seem to differentiate between transactional faxes that might be necessary for a customer to complete a transaction and faxed *ads*, which is what the issue is here.

For the sake of argument, let's say that there was an unwritten, corporate policy (not just Moffett's personal policy) and that it proves that employees were always *supposed* to ask for permission before faxing *ads*. It's not clear from this position how predominance is scuttled by a method of proving, class-wide, that express permission was sought. Now, again, this is not to say that Mr. Moffett's testimony proves what the defendants say it proves or that a fact-finder would credit it. But it shows that the plaintiff's proof will be class wide.

The same goes for the defendants' Salesforce database. The main problem here for the defendants is that they failed to disclose the witness who would testify as to the Salesforce database,

---

[21] Defendants changed their answer nearly two years later, amending their denial to state that they had one or more policies by which they obtained express invitation or permission. [Dkt. #238-8, ¶ 12]. Of course, that still doesn't amount to maintaining any record of those who granted express permission or invitation.

44

and that witness's affidavit has been stricken. [Dkt. #282, #283]. So the defendants are left empty-handed. But even giving credence to the description defendants provide in their response brief, the Salesforce evidence doesn't necessarily show that the defendants invariably got permission from recipients before sending fax ads. According to the brief, the database is a list of businesses that provided defendants with their fax number. [Dkt. #215, at 5]. That can be an element of the "established business relationship" defense, but mere provision of a fax number, as already discussed, doesn't amount to express permission or invitation. And, as with Mr. Moffett's claimed unwritten permission policy, the Salesforce database, to the extent it shows anything, is another method of class-wide proof.

If the defense of "established business relationship" is removed from the equation, *as defendants have chosen to do here*, it would seem that, in every case, individualized issues of express permission would predominate, thus precluding class actions in junk fax cases. Yet, class certification in these cases is the norm. *Turza*, 728 F.3d at 684. Most courts have found on the record before them, that common issues predominate even when the defendants raise the defense of express permission if the defendants' proof is based on some sort of class-wide database, routine, or system. The objections relating to predominance that defendants raise here are based on class-wide evidence – some unwritten policy or a database list – that would rise or fall throughout the class without the specter of unlimited mini-trials. *See, e.g., Zeidel v. A&M (2015) LLC*, 2017 WL 1178150, at *5 (N.D. Ill. Mar. 30, 2017)("Defendant's alleged uniform practice of sending substantially similar text messages to the class members, its 'policy of collecting the Class member's cellular telephone numbers orally,' alleged use of an ATDS, and alleged lack of written consent predominate over any individualized issues."); *Wilkes v. CareSource Mgmt. Grp. Co.*, 2016 WL

7179298, at *7 (N.D. Ind. Dec. 9, 2016)(defendant's use of Marketplace system class-wide meant that common questions could still predominate even if defendant raises a consent defense); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014)(defendants fail to show that defense of permission can or would vary among class members); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 294 (N.D. Ill. 2014)(the issue of individual consent could be addressed on a class-wide basis where the source of the contact information for all of the recipients of unwanted faxes was a single "leads" list); *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008)("The fax broadcasts at issue were sent *en masse* to recipients identified on a singular 'leads' list obtained from a singular source.").

One additional issue tips the scales in favor of class-wide issues predominanating: the requirement of an opt-out notice. Under binding Seventh Circuit precedent, all faxed advertisements must include compliant opt-out notices. "Even when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages." *Turza*, 728 F.3d at 683 (citing 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D)). *See also Chapman v. First Index, Inc.*, 796 F.3d 783, 784 (7th Cir. 2015)(TCPA "establishes some simple rules that many fax senders ignore . . . [including] that commercial faxes include instructions about how to opt out of receiving more."). So, regardless of whether the recipients in this case gave express permission or had an established business relationship with defendants, the faxes at issue had to include opt-out information that complied with the TCPA's requirements. *See* 47 U.S.C. §227(b)(2)(D)).

The requirements for the notice are specific:

(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement; (ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes--

> (I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and
>
> (II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses . . . .

47 U.S.C.A. § 227(b)(2)(D). This, it bears repeating, is capable of class-wide resolution. Either the notices on the three dozen faxes comply or they don't. It's not a question of mini-trials and individualized proof.

The other issue defendants raise is the fact that they sought, and the F.C.C. granted, a waiver from any requirement that faxes sent with prior express permission include an opt-out notice. Again, however, this is a class-wide concern. If the defendants can establish they had express permission to send faxed advertisements – through its class-wide methods of proof – then whether the waiver is applicable can also be determined on a class-wide basis. There is nothing individualized about it. *See, e.g., Physicians Healthsource, Inc. v. A S Medication Sols., LLC,* 2016 WL 5390952, at

47

*10 (N.D. Ill. Sept. 27, 2016)(". . . the question of whether waiver precludes suit is a question that can be resolved on a class-wide basis."); *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *5 (S.D. Fla. Dec. 24, 2014)(". . . even if [defendants] could obtain a waiver and prove consent, that would still create another class-wide question: whether the FCC can grant a retroactive waiver that would apply in civil litigation between private parties.").

## H.
## Superiority

Finally, the plaintiff must also demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Superiority" must be assessed in terms of class members' interests in proceeding individually, the extent and nature of existing litigation, the desirability of concentrating the litigation of the claims in this particular forum, and manageability concerns, which in turn requires a court to consider "the costs and benefits of the class device." *Id.* at 663-64. Regarding this last factor, the Seventh Circuit has advised that "refusing to certify on manageability grounds alone should be the last resort." *Mullins,* 795 F.3d at 663-64. Here, however, plaintiff has already failed to establish that client (and counsel, who the plaintiff treats fungibly and without any attempt to distinguish one from the other) are adequate representatives for the putative class, so the flaws in plaintiff's superiority showing are worth some discussion.

As for the first factor – class members' interests in proceeding individually – plaintiff states, simply and unadornedly, that "class members have little economic incentive to sue individually." [Dkt. #204-1, at 23]. On the one hand, the incentive argument seems obvious, and court after court agrees, that "small recoveries do not provide the incentive for any individual to bring a solo action

prosecuting his or her rights." *Pastor*, 487 F.3d at 1047. But no court has suggested, let alone held, that adequacy of representation follows inexorably from a single individual's lack of incentive to bring his own private action in a fax case. Quite the contrary.

We are repeatedly cautioned that a class can only be certified after a "rigorous" analysis, that it is the plaintiff's burden to convince the court that all prerequisites for certification are met, and that Fed.R.Civ.P 23 is not merely a pleading standard. *See Wal–Mart Stores, Inc.,* 564 U.S. at 350-51; *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015); *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Thus, it is not sufficient merely to assert that individuals may not have an incentive to file an individual action, or that maintaining this class action, in which, for Class A, the recipients of the faxes are unknown, in this forum is preferable to individual suits or suits. If that were enough, certification would be virtually automatic, and Rule 23 would not have the specific requirements it does. Not only do "general propositions ... not decide concrete cases," *Lochner v. New York*, 198 U.S. 45, 76 (1905)(Holmes, J., dissenting), but the insistence on "rigorous" analysis in class action cases would not exist if the plaintiff's argument were accepted.

Thus, it is not enough to say that a small recover is a disincentive to the filing of a suit under the Act and that a class action is thus essential. After all, individual suits were contemplated by the drafters of the Act. *See* 137 Cong.Rec.S. 16205-06 (daily ed. Nov. 7, 1991)(statement of Sen. Hollings); *see also Italia Foods, Inc. v. Sun Tours, Inc.*, 986 N.E.2d 55, 63 (Ill. 2011). And, what about individuals like the plaintiff that received many, if not most, of the 32 faxes, and for whom the potential recovery cannot be said to be insignificant. Assuming punitive damages can be shown, the plaintiff's recovery for 32 faxes would be $48,000; without punitive damages, recovery would

be $16,000. The economic injury suffered in relation to that recovery is minuscule; as already noted, about 70 cents. Thus, the plaintiff stands to get a substantial recovery for deleting an email or throwing a fax in the trash once a month over the course of three and a half years. It is certainly not beyond the realm of possibility that such an individual would file suit, even if a class action was not feasible. But, as we have shown, the statute is what it is and must be enforced as Congress intended it be.

As for the second factor, the plaintiff says there is no pending litigation. Perhaps that's true. But perhaps not. A lawyer's unsupported statement in a brief is not evidence. *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012); *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir. 2008). But that's all the plaintiff provides here. Did counsel perform any search of dockets? There is certainly no proof beyond the declaration's conclusion. We are not being hypertechnical. Either the Seventh Circuit's repeated demands that there be evidence and its repeated rejections of a lawyer's unsupported assertion in a brief have meaning or they do not. They are not, as the Seventh Circuit said in another context, merely "throwaway line[s] in [an] opinion." *Creative Montessori Learning Centers*, 662 F.3d at 918.

As for the third factor – desirability of litigating the claims in the instant forum – plaintiff submits, without citation to any authority, that "judicial efficiency is best served by litigating all claims in one proceeding." As with the other factors, it is standard practice to accept counsel's *ipse dixit* on this point. The advisory committee comments tell us that the provision concerns the "desirability of concentrating the trial of the claims in the particular forum by means of a class action, as opposed to allowing the claims to be litigated separately in forums to which they ordinarily would be brought." Fed.R.Civ.P. 23(b)(3)(1966 Amendment)(advisory committee comments).

50

Notably, the advisory committee speaks not only of whether a class action is the preferred method of litigation, but whether "the particular forum" where the class action was brought is desirable. Other than Chicago being convenient for lead putative class counsel, it's not clear why it was chosen, because, as already noted, there are complaints about having to travel from Cincinnati to comply with routine discovery. Still, courts generally assume that it is more efficient to dispose of multiple claims in one proceeding – regardless of location – than multiple proceedings in multiple fora.

Given thousands of recipients in both classes might have brought claims, that's a valid assumption. But many may not have been vexed by deleting an email once a month and would not choose to litigate as the plaintiff did here, or, unlike the plaintiff here, might have bothered to complain to the sender or sought to opt out. Many may have given express permission to the defendants. Many, many more may have, as the defendants claim, simply consented, in layman's terms, to receiving the faxes. Although that would not qualify as express permission and preclude a claim from a legal standpoint, it wouldn't result in an actual claim being filed.

But, as already noted, it is essentially *de rigueur* to accept that the first three factors listed in Fed.R.Civ.P. 23(b)(3)(A) point to the class action as the superior method for adjudicating junk fax claims. And we do so here, not reflexively, but based on this record. Still, the defendants do not concern themselves with the factors listed in Fed.R.Civ.P. 23(b)(3)(A)-(C). [Dkt. # 215, at 23-26]. The hill the defendants choose to fight on is Fed.R.Civ.P. 23(b)(3)(D), which directs the court to consider the likely difficulties in managing the class action. It's a dicey factor in this instance, at least with regard to proposed Class A. The plaintiff has the transmission records – showing recipient phone numbers – for just 3 of the 32 fax broadcasts. Plaintiff essentially concedes that there is no record of phone numbers for the other 29 fax broadcasts, the broadcasts that are the vast part of Class

A.  Plaintiff also concedes that this is a significant problem in terms of manageability; in terms of how one goes about identifying  the individual class members, giving them notice, or paying out damages awards. [Dkt. #204-1, at 24-25].

But, for plaintiff, the only answer is to certify both classes anyway because the problem of manageability stems from the defendants not having kept records of those to whom they sent faxes. Plaintiff does not argue, nor does it cite any case law holding, that it is incumbent upon businesses to maintain lists of recipients of their faxes, but submits that it wouldn't be fair to scuttle the class because the defendants didn't keep track of their faxes.  Perhaps, but the question remains as to how the class members will be identified and contacted.

Fed.R.Civ.P. 23(c)(2) requires "the best notice that is practicable under the circumstances . . . ."  Here, plaintiff espouses notice by publication, which has been employed in junk fax cases. *See, e.g., Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 255 (N.D. Ill. 2014); *CE Design v. Beaty Const., Inc.*, 2009 WL 192481, at *10 (N.D. Ill. Jan. 26, 2009).  It explains that publication notice can be provided and whatever claims are filed can then be paid. The remainder of the aggregate award would be distributed via *cy pres,* which generally involves a "distribution to a group that will use the money for the benefit of class members." *Turza*, 728 F.3d at 689.  Plaintiff doesn't indicate what group that might be or why other options would not be available. *See Turza*, 728 F.3d at 689. Under Seventh Circuit precedent, a bit more than guesswork and pointing to alternatives (none of which is chosen) is required from the plaintiff.  *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 672 (7th Cir. 2015)("district courts have discretion to press the plaintiff for details about the plaintiff's plan to identify class members.").  But, no matter, as the class cannot be certified on the showing plaintiff has made.

52

The defendants complain that "[g]iven the potential liability of over $200 million and the resulting pressure to settle were class certification to be granted, it would be fundamentally unfair to . . . certify a class" where a majority of the members may have consented to receive faxes. [Dkt. #215, at 26]. But that's the nature of the TCPA. Judge Posner has called the penalties for sending faxes "draconian," *Creative Montessori*, 662 F.3d at 915, but has also said that (in many cases) it is frivolous to suggest that claims might be brought on another basis than class action litigation. *Johansen v. GVN Michigan, Inc.*, 2015 WL 3823036, at *1 (N.D. Ill. June 18, 2015)(sitting by designation).

That means the threat of massive damage awards that far exceeds any harm that might have been suffered by the plaintiff and often leads to settlements even when there exists a defense to the action. *See CE Design Ltd.*, 637 F.3d at 723. But, as we have noted, "Congress's decision that, to prompt compliance, the requirement needed bite in the form of at least $500 in statutory damages for each violation. Congress wanted to put an end to unsolicited fax advertising." *Bais Yaakov*, 852 F.3d 1078, 1079 (D.C. Cir. 2017)(Pillard, J., dissenting). Any claimed unfairness is a legislative problem, not a judicial one. "[T]he statute, with its draconian penalties for multiple faxes, is what it is." *Creative Montessori*, 662 F.3d at 915. *See also Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011)("judges must implement its rule whether or not they think it wise...."); *see also* cases cited *supra* at 7. And the defendants ought not to forget that it is, after all, their own choice to offer cookies and beach towels through fax blasts in the thousands despite a law that very clearly is designed as an *in terrorem* device against the practice.

**CONCLUSION**

For the foregoing reasons, the plaintiff's motion for class certification [Dkt. #204] is denied.

The plaintiff can continue to maintain its own suit against the defendants, if it chooses.

ENTERED: _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:**  6/2/17

54